EMMA L. HOLLINGSHEAD

*v.*

RICHARD M. HOLLINGSHEAD.

[Decided February 27th, 1920.]

1. A decree of divorce by a foreign state between parties domiciled in this state, who have gone to such foreign state in order to obtain such decree for a cause not ground for divorce in this state, is absolutely void under *P. L. 1907 § 33.*

2. A decree of divorce by a foreign state between parties domiciled in this state is absolutely void for lack of jurisdiction.

3. The invalidity of such decree may be set up in a collateral suit in this state.

4. The party obtaining such decree is not estopped by reason of having so obtained it. from setting up its invalidity in a suit in this state.

5. Nor will such party necessarily be refused relief in equity, even though such void foreign decree was obtained by him or her by false representations to the foreign court as to the facts of domicile.

6. Where the complainant in this court attacks the validity of such foreign decree so obtained, equity will examine into all the facts and will accord or refuse the prayer of the bill upon general equitable principles, according to whether or not it deems it conscionable so to do.

7. Where the obtaining of such void foreign decree by such false representations by the wife to the foreign court is in fact the scheme and act of the husband, effectuated through his fraud and duress upon and control over the wife, the wife in the absence of other circumstances will be granted relief in this court.

8. Where complainant sues for maintenance under the statute, and it appears that she had previously obtained a decree of divorce from defendant in Nevada by false representations to the Nevada court, and that

defendant has since married another woman, and that complainant has accepted a lump sum in lieu of alimony pursuant to an agreement approved by the Nevada decree, nevertheless, she will not be denied relief, where it further appears that the Nevada proceedings were against her wishes, and were the .result of fraud and duress, or conduct in the nature thereof by her husband, that her acts in that behalf were really the acts of her husband, that his second marriage occurred shortly after the granting of the decree, and it does not appear that complainant knew of the contemplated second marriage, or that she has been guilty of undue delay, and she tenders to defendant the return of the lump sum payment except a portion lost through unfortunate investment.

9. An agreement between husband and wife for the wife's support is binding upon the wife only to the extent that it is fair and just.

10. Such an agreement is no bar to a suit by the wife for maintenance, where the assent of the wife thereto is the result of fraud or duress, or conduct in the nature thereof, on the part of the husband.

11. Neither is it a bar to her suit that a lump sum has been paid to her pursuant to such agreement and that she cannot restore said sum to the husband, where it appears that the agreement was the result of fraud or duress by the husband, that the wife has lost part of the sum through unfortunate investment, and she tenders the return of the balance.

12. The fact that a husband has provided an annual income of $4,800 for his wife's support is not necessarily a bar to her suit under the statute—it appearing that he has "a large amount of real and personal property," and an annual income in addition of at least $20,000.

13. Special replication stricken out for defects in form, as violating chancery rules 44, 46, 53, 56 and 57.

On bill, &c.  On motion to strike out special replication.

*Messrs. Wescott & Weaver,* for the complainant.

*Mr. Lewis Starr,* for the defendant.

BUCHANAN, V. C.

Complainant has filed her bill for maintenance under the twenty-sixth section of the Divorce act, alleging that defendant is her husband, and that he abandoned her in October, 1916, and has ever since refused to support her.  She further alleges that he has a yearly income of $20,000.

Defendant, by his answer, sets up two defences.  In the first place, he denies that he is complainant's husband—alleging that

complainant on April 26th, 1917, and subsequent to the alleged abandonment, became domiciled in and a *bona fide* resident of Nevada, and there instituted a suit for divorce against defendant, wherein she alleged herself such resident, under oath; that defendant appeared and answered in that suit; that the Nevada court had jurisdiction and duly entered November 24th, 1917, a final decree of divorce in favor of complainant, which still remains in full force and effect. In the second place, he alleges that, at or about the time of the Nevada decree, and pursuant to the terms of an agreement in that behalf between the parties, he paid to her, and she received, for her support and maintenance $5,000 in cash and $60,000 par value of an eight per cent. preferred stock; that the Nevada decree adjudged such settlement a suitable provision for her support; that she has ever since received $4,800 annual income in dividends from said stock. He further alleges his subsequent marriage to another woman, March 20th, 1918—in the belief that the Nevada decree was valid; and that complainant is not now nor has been since April 26th, 1917, domiciled in or a resident of this state.

Complainant obtained leave to file special replication, and filed the replication which defendant now seeks to have struck out. The pleading in question, it must be confessed, is prolix and couched in verbiage rather more apt for a forensic address than a formal pleading, and lacks explicitness as to admissions or denial of the allegations of the answer. It was the desire of both counsel, however, that the determination of the motion might go to the substance of the issues involved, and I think that the statements of the replication may fairly be taken as tantamount to the following: An admission of the Nevada suit and decree, coupled with a denial of the *bona fides* of complainant's residence in Nevada, and consequently an assertion of lack of jurisdiction in the Nevada court, and therefore of the invalidity of the decree of said court; that she did not read or know the contents of the petition which she signed and swore to in that cause; that she went to Nevada, instituted the divorce action there, and agreed to the settlement of $65,000 for her support, and received and accepted the same, all at the instigation of her husband and under and because of compulsion and mis-

representation by him; that she learned of defendant's alleged fraud and misrepresentations and of her rights in the matter a few weeks after the date of the Nevada decree; that defendant did contract a second marriage March 20th, 1918, and that his infatuation for the woman he then married was the cause of his treatment of complainant; that she has lost, by unfortunate investment, $19,000 of the $65,000 (par value) of stock, but offers to return to defendant the balance thereof; she denies that she is not a resident of this state.

Numerous grounds of objection are specified by defendant in his motion to strike out, some going to the merits, others to the form. Dealing first with those addressed to the substance of the issues involved, they may be succinctly stated as follows:

1. Notwithstanding the facts as alleged in the replication, the Nevada decree is valid and a bar to complainant's suit.

2. Whether or not the Nevada decree be invalid, complainant is estopped, on her own showing, from denying its validity.

3. Notwithstanding the facts alleged in the replication, the executed agreement of lump sum payment by way of support is valid and binding on complainant, and hence a bar to her present suit.

4. Whether or not the agreement in satisfaction of the duty to support and maintain be valid, complainant cannot attack it, or have it set aside without a repayment or offer to repay, and as to $19,000 of the payment, such restoration has not been offered and cannot be made.

5. Irrespective of the agreement, the $65,000 in fact was paid by defendant to complainant, and the income of $4,800 therefrom is in fact support and maintenance of complainant by defendant.

1. On the first ground, defendant must fail. Our Divorce act contains the following provision (which was not adverted to by either counsel):

"Provided that if any inhabitant of this state shall go into another state, territory or country, in order to obtain a decree of divorce for a cause which occurred while the parties resided in this state, or for a cause which is not ground for divorce under the laws of this state, a decree so obtained shall be of no force or effect in this state." *P. L. 1907 p. 483 § 33; 2 Comp. Stat. p. 2042.*

The Nevada decree shows that it was granted for the cause of a desertion from October 23d, 1916, to October 26th, 1917 (the date of the Nevada petition), or at most, to November 24th, 1917 (the date of the decree). Desertion for less than two years is not a cause for divorce in this state. Obviously, therefore, under this provision of the statute, complainant having gone to Nevada for the purpose of obtaining a divorce for a desertion of less than two years, the decree is of no validity in this state.

This provision of the statute has been enforced in *Jung* v. *Jung, 85 N. J. Eq. 372; Lister* v. *Lister, 86 N. J. Eq. 30; Thompson* v. *Thompson, 89 N. J. Eq. 70.*

Furthermore, the same result must needs be reached irrespective of that legislation. From the statements in the replication, it is clear that although complainant lived in Nevada for six months prior to instituting her suit, the *animus manendi* was lacking, and the decree will be denied validity here. It was obtained by fraud (*Magowan* v. *Magowan, 57 N. J. Eq. 322; Jung* v. *Jung, supra*), and irrespective of the fraud, the Nevada court was without jurisdiction. *Lister* v. *Lister, supra; Thompson* v. *Thompson, supra.*

2. Complainant next argues that even if the degree be invalid, complainant is estopped from setting up its invalidity, since it was she herself who instituted the proceedings and obtained the decree.

In the ordinary case (*i. e.*, a suit between parties having no such relationship with each other as husband and wife, or parent and child), doubtless such estoppel would arise against the complainant. Certainly a request by a party who had *fraudulently* obtained a judgment or decree to set aside such decree or judgment or treat the same as invalid because fraudulently obtained, would scarcely commend itself to a court of equity. And such estoppel would be strengthened, if that were necessary, by the fact that the other party, against whom the fraudulent judgment or decree had been obtained, or some third party, relying upon the validity of that judgment had altered his position. In the present case the husband subsequently remarried.

But, I take it that there may be circumstances which would avoid the arising of any such estoppel. If, in the instant case, the fraudulent procurement of the decree by the wife had been caused by actual and undoubted duress and compulsion—if, for instance, she had been compelled thereto by a pistol at her head and under the threat and fear of immediate death—I cannot imagine that this court would hold her estopped from setting up the invalidity of the decree. In such a case, if an estoppel exists against her, an estoppel would arise against such estoppel.

In the case with which we are dealing, however, it seems to me that no estoppel can exist against the wife's setting up the invadidity of the foreign decree.

The situation is not one where a decree, otherwise valid, has been fraudulently obtained. Such a situation would exist, if the divorce decree had been granted by this court, through the collusion of the parties. Even in such a case, although it has been held in some jurisdictions that such a decree may not be attacked even directly by either of the parties, it is by no means clear that such decision is or should be based upon any doctrine of estoppel; and furthermore, considerations of public policy (for the same reasons about to be adverted to), would seem to dictate that no such estoppel should be held to exist. See *14 Cyc. 718, note 46.* Certainly if one of the guilty parties quickly repented and made application to repair the wrong-doing, there cannot well be imagined any good reason against permitting it to be done. Yet that could not be done if an estoppel existed.

The foreign decree, as has been pointed out, is not merely voidable, but void, for lack of jurisdiction; and is one which our statute says "shall be *of no force or effect in this State.*" Bearing in mind the fundamental principle that the matrimonial status is a matter of concern not merely to the two spouses but equally so to the state, it seems to me that the legislature has laid down, by the statutory provisions aforesaid, a definite pronouncement of the public policy of this state, the result of which must be to preclude the consideration of questions as to whether or not one of the parties is estopped from setting up its void character.

Logically, of course, where an estoppel is claimed to exist

against an assertion set up by one of the parties, the determination of the issue as to whether or not such party is estopped from asserting his contention, precedes any inquiry into the issue upon the contention itself; and if the estoppel be found to exist, the inquiry into the truth or falsity of the contention against which the estoppel exists, is never reached. But in this case, the answer to the claim of estoppel is not that the estoppel *does not exist,* but that it *cannot* exist.

The contract of marriage is one which may not be dissolved or abrogated by the will of the parties—the state must consent and act to accomplish such dissolution. If the husband and wife signed an agreement purporting to terminate the marriage relation, it would of course be void, and neither party would be heard to claim that the other party was estopped from asserting its invalidity. The question of whether or not the acts of the litigant had or had not been such as to estop him from asserting the invalidity of the "agreement," whether or not the alleged estoppel *did* exist, would be precluded from consideration by the answer, and the fact, that it *could not* exist.

So, too, if instead of signing a mutual agreement of dissolution of the marriage, the parties had gone to the minister who married them and procured him to sign a certificate purporting to divorce them. Wherein is there any difference between the last hypothesis and what the parties in this case actually did? They went to a Nevada court and procured from it what purports to be a decree of divorce, the Nevada court, under the circumstances, having no more jurisdiction, power or authority in the matter than the minister aforesaid would have had, and its decree being of no more value or validity than the minister's "certificate" in the supposititious case.

Is it not clear, therefore, that there *cannot* be any estoppel against the contention of complainant that the Nevada decree is, as the legislature has said, "of no force or effect in this state?" To hold otherwise, would obviously be to hold that spouses, residents of this state, may do in this way, that which they are not and cannot be permitted to do, namely, divorce themselves without the consent and act of this state, through its sole constituted agent in that behalf, the court of chancery.

The authorities on the question are few, and in conflict. *2 Bish. M. D. & S.* § *187*, says:

> "There cannot be a divorce jurisdiction by consent. And the principle upon which this proposition proceeds would seem to exclude estoppel as either giving or taking away jurisdiction. The question has not been much considered by the courts; still we have some intimations, not all of which are quite beyond question, such as that a plaintiff who has accepted the benefit of a divorce decree cannot deny the authority of the court by which it was rendered (citing cases). On the other hand, it has been held that one who has obtained such decree is not estopped to deny its validity (citing cases)."

The view that no such estoppel exists is supported by *Holmes* v. *Holmes, 4 Lans.* (*N. Y.*), *388,* and *Smith* v. *Smith, 13 Gray* (*Mass.*) *209.* Both of these cases are suits for divorce brought by the party who had previously procured a divorce decree in a foreign state, which decree was void for lack of jurisdiction. Both were brought within a few years after the foreign suits, and both are decided on demurrer—so that the issue was squarely presented, and devoid of conflicting or confusing elements of evidence. Both deny the existence of estoppel and decide that the complainants are entitled to the decrees of divorce then presently sought. The reasoning by which the result is reached is along lines similar to that hereinbefore pointed out, and seems to me to be sound.

See also *Todd* v. *Kerr, 42 Barb.* (*N. Y.*) *317;* and *Moe* v. *Moe* (*N. Y. Sup. Ct.*), *2 Thomp. & C. 647.*

See also *Perry* v. *Meddowcroft, 10 Beav. 132,* where it is conceded that a child bastardized by a decree of nullification of his parents' marriage, is not estopped from attacking that decree collaterally, on the ground of fraud and collusion. If there were an estoppel, it would operate against those claiming under the original parties as well as the parties themselves.

As to the contrary view, that an estoppel does exist:

In *14 Cyc. 822,* it is said: "A party who has obtained a foreign divorce cannot thereafter be heard to impeach the decree or deny its validity," citing a few cases.

I have examined a very great number of cases cited in the books as purporting to be authority for that doctrine. Aside

from *Ellis* v. *White,* *61 Iowa 644,* I do not recall a single one which upon examination could fairly be considered as squarely upholding the principle (and even in *Ellis* v. *White* there did exist the additional facts of long delay and acceptance of alimony). They will all be found to have been decided, either in express language, or in actual fact, upon and because of additional circumstances, such as long delay, acceptance of benefits such as alimony or remarriage, remarriage of the other spouse (with or without the birth of children by the second marriage), the motive of the complainant in the new suit, and the like, and in many of them it will be found that the decree attacked was voidable and not void.

To attempt to cite them all would be a work of supererogation, if indeed possible. Among them may be mentioned *Elliott* v. *Wohlfrom,* *55 Cal. 384; Richardson's Estate, 132 Pa. St. 292; Loud* v. *Loud, 129 Mass 14* (rested on "connivance"); *Re Morrison, 52 Hun* (*N. Y.*) *102; Re Swales, 60 N. Y. App. Div. 599; affirmed, 172 N. Y. 651; Starbuck* v. *Starbuck, 173 N. Y. 503; Holmes* v. *Holmes* (*N. Y.*), *8 Abb. Pr. N. S. 1* (reversed on appeal; see *S. C., supra*); *Karren* v. *Karren, 25 Utah 87; Palmer* v. *Palmer, 1 Swab. & T. 551; Crabill* v. *Crabill, 22 Ore. 588; Lacey* v. *Lacey, 77 N. Y. Supp. 235; Miltimore* v. *Miltimore, 40 Pa. 151; Asbury* v. *Powers* (*Ky.*), *65 S. W. Rep. 605; Kirrigan* v. *Kirrigan, 15 N. J. Eq. 146; Nichols* v. *Nichols, 25 N. J. Eq. 60.*

The last named two cases, being decisions of this court, may well be referred to specially. The Kirrigan suit was by the wife for divorce; a prior divorce had been obtained by the husband in a foreign state, in an action in which she had appeared; she had accepted alimony under the foreign decree. The decision (which was on cross motions for alimony and discharge of *ne exeat*) is rested on *both* facts—

"The wife having appeared to the suit *and* having accepted the amount awarded to her by the decree for alimony, will not be permitted to impugn the decree on the ground that it was fraudulently obtained."

And furthermore, it is added:

"Even if the decree might be legally assailed upon this ground, it must be presumed to be valid until the fraud is clearly established in evidence."

In the *Nichols Case* the decision was not that the foreign decree though void was protected by estoppel, but on the contrary it expressly holds the foreign decree valid though collusive. Though the correctness of the decision as to the validity of the foreign decree may now be doubted (see *Watkinson* v. *Watkinson, 67 N. J. Eq. 142,* at *p. 158*), that cannot turn the decision into one upholding estoppel.

In *Yorston* v. *Yorston, 32 N. J. Eq. 495,* the validity of the foreign decree as to jurisdiction was not attacked, and the opinion so points out.

On the other hand, *Watkinson* v. *Watkinson, supra,* is authority in the other direction. It is there said (at *p. 156*) :

"It is difficult to perceive how a decree for divorce which is absolutely void by reason of the want of jurisdiction of the person can be validated by any action or non-action of the party defendant, any more than can a marriage within the prohibited degrees. To hold that a defendant in such a case can validate a void decree, is to permit parties to procure a divorce by agreement between them, which is contrary to first principles governing this subject.

"It is perhaps possible that a female defendant against whom a void decree of the character just mentioned stands of record may be debarred by her conduct from having awarded to her affirmative relief against her husband, based on the fact that the decree is void. But, granting that her conduct may disentitle her to affirmative equitable relief or remedy, it cannot validate the decree."

It is true that Vice-Chancellor Pitney was there dealing with a question of acquiescence by an innocent wife who had not participated in obtaining the void decree, instead of a collusion in obtaining such decree, but the reasoning is equally applicable. It is also true that the decision in this case was overruled (*Watkinson* v. *Watkinson, 68 N. J. Eq. 632*), but not on this point.

The question, then, being open in this state, I conclude that since the decree without jurisdiction is *absolutely void,* and,

·therefore, open to attack by third parties and in collateral pro-- ceedings (Carron v. Martin, 26 N. J. Law 594; 2 Bish. § 1545), there can be no estoppel against its attack by the original parties quoad hoc. See, also, Trenton and Mercer County Traction Co. v. Ewing, 90 N. J. Eq. 560, where the court of errors and ap- peals holds that where a municipality is given power to do an act by "ordinance, and not otherwise," it cannot be permitted to urge an estoppel against the municipality's proof that no such ordinance was passed, since to permit such an estoppel "would nullify the statutory prohibition." So, in the case at bar, the admission of an estoppel would nullify the statutory prohibition of the Divorce act.

It by no means follows, however, that a party who has ob- tained such a void decree will be granted relief in this court as though he or she had been guilty of no misconduct in regard thereto.

One of the most familiar maxims of equity is, that he who comes into equity must come with clean hands. The principle which is embodied in this maxim is rather broader than that statement of it. It is not merely that a court of equity will neither assist one in the furtherance of, nor relieve him from the consequences of, an alleged act or scheme. It will not grant re- lief in assistance of a complainant in an attempt which it deems unconscionable. And the conduct which makes the prayer for relief unconscionable need not have been directed toward the other party to the suit—it may have been toward third parties or the public. A frequent illustration is found in the case of a grantor in fraud of creditors who is refused relief in a suit to recover back the property from the fraudulent grantee. So, also, the principles of laches, acquiescence, quasi-estoppels from changed circumstances, and the like, are or may be involved.

It is upon these grounds that the results in what may be called the "estoppel cases," cited supra, were actually reached and may be sustained.

It is furthermore obvious that fraud or duress upon the party fraudulently obtaining the void decree is a very vital circum- stance, and, as I have hereinbefore indicated, I am clearly of

the opinion that clear fraud or clear duress upon the party fraudulently obtaining the void decree of divorce, by the other party, would, if no other circumstances appeared as equitable factors in the case, be a sufficient excuse to enable this court to grant the relief which might otherwise have been denied because of the fraudulent conduct in the obtaining of the foreign decree.

*Holl* v. *Holl, 23 Okla. 639,* and *Lake* v. *Lake, 108 N. Y. Supp. 964,* are both cases where the divorce suit is brought by the wife, and the decree obtained by fraud or collusion, the acts of the wife being caused by the fraud or duress of the husband, and the wife is held excused and not denied relief. *Galloway* v. *Galloway, 125 Md. 511; O'Rourke* v. *Lawrence, 132 La. 710,* and *Butler* v. *Butler, 34 Okla. 392,* are cases where the same result is reached under circumstances similar except that the wife instead of being the nominal instigator of the divorce suit was a defendant participating in the obtaining of the decree. I cannot see that this difference in anywise affects the principle. *Tausick* v. *Tausick, 52 Wash. 301; Robinson* v. *Robinson, 77 Wash. 663; Uecker* v. *Thiedt, 133 Wis. 148; 137 Wis. 634; Routledge* v. *Palterson, 146 Wis. 226; Re Brigham* (or *Brigham* v. *Dillaway), 176 Mass. 223,* and *Re Ellis, 55 Minn. 401,* are all cases where the principle is recognized, although the wife is denied relief because it is found that the alleged fraud or duress of the husband did not in fact exist, or laches or other equitable bars to the wife's relief did exist. (The last-named case is cited as denying that fraud or duress can be sufficient excuse, and the head-note justifies the citation, but the opinion itself does not go that far. It expressly bases its decision on this aspect of the case upon the fact that it was a collateral proceeding *and* the facts that the wife had accepted alimony in lump sum, and had delayed for eight years, the husband meanwhile having remarried and finally died, and the wife's object now being to get his property as his widow.)    In some of the cases cited the divorce was by a court of a foreign state, in others by the same court or a court of the same state as that where the new suit is brought. I cannot see that this difference is material, in regard to the principle under discussion.

I have been able to find no case in this state on the question of whether fraud or duress by the husband causing the wife to procure or participate in obtaining a void or voidable divorce by collusion or fraud upon the court is sufficient excuse to prevent the wife from being denied relief against such decree (though there is, perhaps, an intimation that it would be a sufficient excuse, in the language at the foot of page 64, in *Nichols* v. *Nichols, 25 N. J. Eq. 60*), but I have no hesitation in holding that it will be, in the absence of other circumstances.

While it may well be that in the absence of such fraud or duress, either colluding party should be denied relief as being *in pari delicto* (and even there, as I have intimated, if one of the parties, honestly repentant and for the purpose of repairing his wrong, without delay seeks to have the decree annulled, I am by no means sure that such application should be denied), yet it is clear that where such fraud or duress exists the parties are not *in pari delicto;* and that doctrine is quite strictly applied in this court. See *Pitney* v. *Bolton, 45 N. J. Eq. 639* (at *p. 643*); *Buttlar* v. *Buttlar, 67 N. J. Eq. 136* (at *p. 141*). *Cf.* also *Buttlar* v. *Buttlar, 57 N. J. Eq. 645*, holding that, although a separation agreement will not be enforced as to the separation, it being against public policy, yet where as a part of such agreement the wife conveys property to the husband, and husband covenants to make payments for her support, relief will not be denied her when she sues in equity for such payments. And even more significant is the opinion in *Power* v. *Power, 66 N. J. Eq. 320*, where the court of errors and appeals, reversing the decision below, holds that where a husband has deserted his wife against her will, giving her little, if any, support for herself and her children, an agreement of separation (prior to the expiration of the two years) forced upon the wife by the husband's conduct and his threats for the future, did not preclude her from a decree for divorce for the cause of his desertion.

The true rule, then, would seem to be that where a suitor comes into equity and asks for relief, notwithstanding a foreign decree of divorce which if valid would be a bar to his or her suit, which decree is void for lack of jurisdiction, but which was obtained by the present complainant, equity will examine into all

the facts and will accord or refuse its aid upon general equitable principles, according to whether or not it deems it conscionable so to do.

Among the facts and circumstances which are or may be material factors in such a controversy are whether the divorce decree is void or voidable, whether it was obtained by the present complainant, or was participated in by him, whether it was obtained with or without collusion or fraud upon the court or fraud or duress upon the adverse party, whether the other spouse has since died, or married again, whether there are children by such second marriage, whether the complainant has "accepted the benefits" of the divorce, such as alimony or by marrying again, whether or not the other spouse participated in the divorce, or acquiesced, whether complainant has been guilty of laches or undue delay, what the nature of the new suit is and the motive or object of complainant in bringing it; whether the complainant is an original party to the divorce action, or a child, or heir or representative, and the like.

In the present case we have the facts of the void decree of the complainant, the wife, having apparently instituted the foreign action and obtained the decree by fraud upon the foreign court, of her accepting "benefits" under the decree, by the lump sum payment of $65,000 in lieu of alimony, the remarriage of the husband, within a few months after the decree, the delay of the wife for over a year from the decree (October 26th, 1917, to February 13th, 1919) in filing her bill, the object of her suit being support and maintenance from her husband, the loss of a considerable portion of the $65,000 by unfortunate investment, and, finally, the conduct of the husband alleged to constitute or amount to fraud and duress upon the wife, causing her conduct in the matter.

The latter circumstance, it seems to me, is the most important factor in the matter and may be first considered. As was said earlier in this opinion, if the wife's conduct had been caused by undoubted fraud or undoubted duress upon her by the husband, this phase of the case would present no difficulty. The case made out by the wife, however, is not as strong as that, and there is added difficulty by reason of the imperfect condition of the repli-

cation as to clarity and definiteness of its allegations. Those allegations do, however, show that complainant did not obtain the fraudulent decree of her own initiative, nor was it a case where both parties colluded in that behalf for the carrying out of their mutual desires and purposes. They show that the project was that of the husband, for his own benefit, so that (unknown to her) he might be free to marry the woman with whom he was infatuated and whom he did, subsequently, marry; that she herself was earnestly opposed to any such course—desired no divorce, but only that her husband should return to her and perform his obligations as a husband and father; that she was influenced and induced to act as he desired in the matter, by his threats that unless she did so he would continue to leave her destitute and without support (he had already deserted her and left her without support for a period of some six months), and his promises that if she acquiesced in his plans he would adequately provide for her, and his arguments convincing her that her conduct in bringing such suit would not be wrong either legally or morally, and by the further arguments and persuasions to the same effect from other persons (her son-in-law and a friend) whom she believed to be concerned only for her welfare but who in fact were the agents of the husband.

The argument of persuasion would not ordinarily have much weight standing alone. It appears, however, that added to the persuasion of the husband was the persuasion of her friend and companion, and of her son-in-law, upon both of whom she relied as being concerned for her interests, when, in fact, unknown to her, they were the agents of the husband. And stronger still is the compulsion of her husband's abandonment and threats and her own necessities created by him. From her entire recital (which must, of course, upon this motion be considered as true) it is clear that the divorce proceedings, although nominally instituted by her, were in fact not her act but his—that she acted merely as his agent in the whole scheme.

The case made out is, perhaps, pretty close to the line, and in a case between parties other than husband and wife (or those analogously circumstanced); it is doubtful that a case of fraud or duress would be made out. But the wife, as the so-called

"weaker vessel," occupies a position different from that of the husband, upon whom she is dependent, and intendments are frequently made in her favor where they would not be in favor of the man; this is true in equity as well as at law. Torts committed by her in her husband's presence are deemed his, not hers; in inchoate desertions he is called upon to make advances to her, but not *vice versa;* in suits for divorce, that which would be laches in him is not necessarily so in her; agreements between them are enforced only so far as they are fair and just, and the instances might be multiplied.

And, so, I am of the opinion that the allegations of the wife, in the present case, standing without denial, excuse or explanation by the husband, do make out a case of fraud and duress or conduct in the nature thereof sufficient to excuse the wife's conduct in obtaining the divorce.

As to the other elements which are proper to be considered as factors in the equitable situation:

(*a*) *The acceptance of benefits under the decree by the wife— in this case her acceptance of the lump sum in lieu of alimony.* If, as has been shown, the divorce proceedings were, by reason of his fraud and duress, really the husband's act and not the wife's, then the situation in equity is essentially the same as if he had fraudulently procured the divorce against the wife without her participation or knowledge. And, in such a case, it is clear that her acceptance of "alimony" would be no bar, *ipso facto,* to a suit by her for maintenance. Nor would the result be different if the alimony be considered from the standpoint of the contract between the parties concurrent with the divorce decree (although, of course, the contract and the acceptance of the money are important to be considered as evidence in the determination of whether there was in fact fraud or duress). *Cf. Lister* v. *Lister, 86 N. J. Eq. 30* (at *p. 48*); *Buttlar* v. *Buttlar, supra; Power* v. *Power, supra; Kempson* v. *Kempson, 61 N. J. Eq. 303* (at *p. 328*).

(*b*) *The purpose of the present suit—in this case to get support and maintenance.* The same reasoning, as in the preceding paragraph, must lead to the conclusion that under the same circumstances there is nothing in this fact itself which should lead

to a denial of relief to complainant. *Kirrigan* v. *Kirrigan, 15 N. J. Eq. 146; Nichols* v. *Nichols, 25 N. J. Eq. 60,* and *Yorston* v. *Yorston, 32 N. J. Eq. 495,* are cited by some authorities as supporting the doctrine that relief will not be granted where the object of the second suit is alimony. They clearly do not so hold; it is the bad faith of bringing a suit for divorce when the real purpose was alimony which is there pointed out—and in each of them that is not the sole ground of decision—it is coupled with acceptance of benefits, laches, remarriage, and the like.

(c) *Remarriage of the husband.* Neither *Nichols* v. *Nichols, supra,* or *Yorston* v. *Yorston, supra,* hold that this is dispositive on such an application. In both those cases the result is rested on the concurrence of laches with the remarriage. In the present case, it does not appear that the wife knew of the contemplated marriage—and it occurred but a few months after the decree. It does not appear that the second wife was innocent or ignorant. The mere fact of there having been a subsequent marriage, especially when it took place shortly after the foreign divorce, does not impress me as sufficient to raise a countervailing equity. As is pointed out in *Watkinson* v. *Watkinson, 67 N. J. Eq. 142* (at *p. 157*), the second spouse ought to be held to inquiry in the case of a decree of a state foreign to the usual residence of the parties. See, also, *Clayton* v. *Clayton, 59 N. J. Eq. 310* (at *p. 316*); *Kempson* v. *Kempson, 61 N. J. Eq. 303* (at *p. 330*), and *9 Rul. C. L. § 262.*

(d) *Laches.* This, of course, if it existed might well be a sufficient ground for refusing complainant relief. But, in the present case, it does not appear that it exists. The mere facts of there being a period of fifteen and one-half months between the date of the foreign decree and the filing of the present bill cannot be held to be laches *per se,* even if nothing else appeared, and complainant does set up matter in excuse of even that delay.

(e) *Restoration of status quo ante.* Refusal of a complainant to do equity toward defendant to the full extent possible would probably lead to a refusal of this court to lend its assistance to complainant. The case, however, shows no such refusal. Complainant tenders back to defendant all that she has left of the

amount paid her in accordance with the contract; that which she does not offer to return she says she cannot because of its loss in unfortunate investment. I do not see how he can complain of such a loss; it is one of the results of his own wrongdoing. The wife is entitled to support from the husband, and to the exercise of his judgment in the providing of that support. The probable infirmity of the wife, after years of dependence upon him, in exercising sound judgment in dealing with business affairs, must have been known to him, and he took the risk of just such loss when he put his wrongful scheme into execution. See *Holl* v. *Holt, 23 Okla. 639; Cheuvront* v. *Cheuvront, 54 W. Va. 171; Barr* v. *Packard Company, 172 Mich. 299* (a case of repudiation of infants' contract). And it is clearly within the power of this court to make an equitable adjustment as to the moneys received by the wife, as was done in *Lister* v. *Lister, 86 N. J. Eq. 30* (at *p. 49*).

3. Defendant's third contention—that the contract between the parties is binding upon complainant irrespective of the validity of the divorce needs but little comment. For one thing, being a contract made as a part of, and in furtherance of a scheme to obtain a fraudulent or collusive divorce, it would not be enforced as against public policy. Secondly, it being obtained by the same fraud, duress or oppression as the divorce itself, it cannot stand. Thirdly, being a contract between husband and wife, it could be binding in any event only to the extent that it is just and fair. *Lister* v. *Lister, 86 N. J. Eq. 30* (at *p. 48*); *Demarest* v. *Terhune, 62 N. J. Eq. 663* (at *p. 667*); *Pom. Eq. Jur.* § *1121; Calame* v. *Calame, 25 N. J. Eq. 548; 1 Rul. C. L.* § *73; Boehm* v. *Boehm, 88 N. J. Eq. 74; Rennie* v. *Rennie, 85 N. J. Eq. 1; Halstead* v. *Halstead, 74 N. J. Eq. 596.*

4. The effect of the failure to restore the entire $65,000 has been already dealt with under heading 2 of this opinion. What I have said under heading 3 is also pertinent in this connection.

5. *Support in fact.* Defendant's last contention, on the merits, is, that there is shown, in fact, to have been no refusal or failure to support, since the income from the fund he had given his wife was in fact support. I was considerably impressed with the force of this contention, on the oral argument, for,

while it is true that the support furnished must be suitable and proper under the circumstances (*O'Brien* v. *O'Brien, 49 N. J. Eq. 436*), yet I was inclined to think that the admitted fact that the husband had given her a fund for her support from which she was deriving $4,800 annual income (or even $3,200, assuming that the income was proportionately reduced after the loss of the $19,000, although she does not say that the income has been reduced below the $4,800), was sufficient, unless the wife set up special circumstances to show that that sum was not suitable and proper under all the conditions. Upon reflection, however, I am of a different opinion. As is shown in the *O'Brien Case*, the words of the statute, "refuse or neglect to maintain and provide," mean to "maintain and provide in a suitable and proper manner." I think we must accord to these words in the complainant's bill the same force and effect as in the statute. And I am not able to say that the income mentioned is necessarily suitable and proper support, where the husband is possessed of a large amount of real and personal property, and still has "an income of at least $20,000 per annum." What is suitable and proper can only be determined upon evidence as to all the conditions and circumstances of the parties. In *1 Rul. C. L.* § 77, it is said: "The amount of the allowance ordinarily varies from one-half to one-third, or even less." In practice in this state it, perhaps, averages one-third. In the *O'Brien Case, supra,* it would seem to have amounted roughly to about one-fourth. In the present case the income provided for the wife by the gift is obviously less than one-fifth.

There is further another consideration. Complainant is seeking to set aside the whole of the fraudulent scheme, divorce, contract, gift and all and tenders the return of all that she has of what she received. Defendant, doubtless, could never have recovered this money back from the wife by suit of his own, but, morally, she is obligated to return it to him, and I think she is entitled to do so in her effort to wipe out the entire transaction. The result would be to put the parties back where they were before the trip to Nevada, and leave the husband with the unfulfilled duty of supporting his wife.

It is against the policy of the state and beyond the power of this court to decree a lump sum payment for alimony. *Calame v. Calame, 25 N. J. Eq. 548* (except where, as in that case, the defendant had offered, and complainant accepted, such sum in gross and it was decreed in performance of the agreement). *Boehm v. Boehm, 88 N. J. Eq. 74.* Whether in a case free from fraud and duress, where the wife had accepted and received from the husband, by open and fair agreement, a suitable sum in gross, she would be permitted afterwards to rescind and obtain weekly or monthly payments, I am not called upon to decide. But where, as in this case, the soundness of the public policy against such settlements in gross having been demonstrated by the results of the wife's administration of the fund, and the giving and acceptance of the fund being grounded in fraud and duress, I think she should certainly be permitted to refund the sum and ask for support in the manner favored by public policy.

The question of domicile raised by the answer (if it be material, which I have not considered) is probably sufficiently traversed by the general denial in the replication. It is, of course, further obvious that the divorce being void, the domicile of the wife is that of the husband—this state being his domicile and the matrimonial domicile.

The replication is, however, defective in form, and objection is also made on that ground. Chancery rules 44, 46, 53, 56 and 57 are clearly violated. The motion to strike out will therefore be granted, with leave to amend within ten days.