66 N.J. Super. 440 (1961)
169 A.2d 488
ROCCO T. FLAMMIA, PLAINTIFF-RESPONDENT,
v.
CHARLES MALLER, DEFENDANT-APPELLANT, AND THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued March 20, 1961.
Decided March 27, 1961.
*443 Before Judges GOLDMANN, FOLEY and LEWIS.
Mr. Jerome C. Eisenberg argued the cause for appellant (Messrs. O'Brien & Tartalsky, attorneys).
Mr. Fayette N. Talley argued the cause for respondent (Messrs. Leavitt, Talley & Krevsky, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff brought an action in the Chancery Division seeking partition of properties standing *444 in the names of defendant Charles Maller and Mary Maller (formerly Mary Flammia, and now deceased). The property, as described in the amended complaint, consisted of (1) the premises at 811 Rose Parkway, Linden, N.J., in which the Mallers lived, and (2) the lot adjacent thereto. Defendant Maller appeals from the judgment which (1) declared plaintiff and defendant to be owners in common of the property, subject to plaintiff's curtesy right in defendant's undivided one-half part; (2) impressed a lien on all the property in favor of defendant for $4,422.92, representing monies expended by him in payment of taxes, insurance premiums, necessary repairs and similar charges; (3) impressed a lien on plaintiff's undivided one-half interest in favor of defendant, for $1,035.10 expended by him for Mary Maller's funeral; (4) impressed a lien on plaintiff's undivided one-half interest in favor of the State of New Jersey for transfer inheritance taxes assessed or to be assessed by reason of Mary Maller's death; and (5) directed a sheriff's sale of the properties in separate parcels.
Plaintiff married Mary Kuczynski (hereinafter referred to as the decedent) on November 26, 1936. He enlisted in the United States Navy in November 1942, and was discharged in October 1945. While he was in service his wife initiated divorce proceedings in Mexico, and on December 18, 1944 obtained a decree purporting to dissolve the marriage. Plaintiff was never served with any papers, nor did he receive any notice or participate in that proceeding by appearance, answer or otherwise. It is conceded that the decree is null and void.
On May 7, 1947 defendant married Mary Flammia and lived with her as husband and wife at the Linden address continuously for some 11 years until her death on September 22, 1958. She died intestate without leaving any children, either natural born or adopted, or any children of deceased children.
According to the abstract of title in evidence, the property at 811 Rose Parkway was conveyed to "Francis Kuczynski *445 and Mary Kuczynski, his daughter" by warranty deed dated February 3, 1940. Francis was Mary's father, and a widower. Just why the property was conveyed to Mary by her maiden name when she was already married to plaintiff is not explained. On the same day the father conveyed his undivided one-half interest to "Mary Kuczynski," on condition that he be allowed to remain in possession during the term of his natural life and that Mary support him. Difficulties apparently arose between decedent and her father, for he instituted a suit in December 1947 to set aside the transfer of his undivided one-half interest. The suit seems to have been amicably settled, for in October 1948 the father gave his daughter a quitclaim deed in which she was described as "Mary Maller." Defendant contributed $1,500 for this release of the father's interest. Four years later, on December 27, 1952, decedent executed a bargain and sale deed, in which defendant joined, conveying the house to "Charles Maller and Mary Maller, his wife," the deed reciting that its purpose was to create an estate by the entirety.
The lot adjacent to the home was conveyed to "Charles Maller and Mary Maller, his wife" by deed dated December 16, 1952. It appears that defendant paid the entire purchase price, $450.
Plaintiff contended in the Chancery Division that defendant and decedent held the properties as tenants in common and not as tenants by the entirety, since they were not legally married. Accordingly, as Mary's sole heir he was entitled to inherit her one-half undivided interest in the properties by operation of the intestacy laws, and had a right of curtesy in the remaining one-half, his inchoate right of curtesy having become consummate at her death.
On this appeal defendant urges that (1) plaintiff is barred from invoking the aid of a court of equity and asserting his claim as decedent's husband, by reason of estoppel, laches, and unclean hands; (2) the trial court should not have granted plaintiff's prayer to convert the *446 tenancy from an entirety to one in common, but the estate should be deemed a joint tenancy with survivorship in defendant  an issue not raised below; (3) plaintiff, claiming as an heir of his spouse, cannot assert a claim or position which she would have been estopped from asserting or taking; (4) assuming plaintiff to be decedent's lawful husband, he nevertheless holds her interest in trust for defendant  yet another issue not raised below; and (5) assuming plaintiff is entitled to partition, the trial court erred in disallowing reimbursement and contribution to defendant for certain expenses mentioned hereafter.

I.
As noted, defendant concedes the invalidity of the Mexican divorce decree; he so stipulated at the trial. Thus, plaintiff and Mary were lawfully husband and wife at the time of her death. Nonetheless, defendant contends that plaintiff is estopped or barred by laches and unclean hands from asserting any claim as decedent's husband.
A person may be precluded from questioning the validity of a divorce decree if, under all the circumstances, his conduct has led to the obtaining of the decree or for any other reason has been such as to make it inequitable to permit him to deny its validity. Restatement, Conflict of Laws (1948 supp.), § 112, p. 110, comment (c); 17 Am. Jur., Divorce and Separation, § 536, p. 631 (1957). In Schlemm v. Schlemm, 31 N.J. 557, 572 (1960), our Supreme Court observed there were equitable principles which might well be invoked to bar Mrs. Schlemm's collateral attack on a Nevada divorce in which she had participated. The court quoted with approval from Judkins v. Judkins, 22 N.J. Super. 516, 537 (Ch. Div. 1952), where we said:
"Our courts have not hesitated to import into divorce and nullity suits, which are sui generis, maxims and rules commonly applied in equity suits. * * * Among the circumstances which may be material are unclean hands, laches, undue delay, or the generally inequitable conduct of the party seeking relief."
*447 Although the present suit is not a matrimonial action, but one for partition of real property, it does involve a collateral attack on a divorce decree and hence may be barred by the establishment of such equitable defenses as estoppel, laches and unclean hands.
Some of the factors to be considered in determining whether an individual is estopped from collaterally attacking a void divorce decree were set forth in Hollingshead v. Hollingshead, 91 N.J. Eq. 261, 274 (Ch. 1920):
"Among the facts and circumstances which are or may be material factors in such a controversy are whether the divorce decree is void or voidable, whether it was obtained by the present complainant, or was participated in by him, whether it was obtained with or without collusion or fraud upon the court or fraud or duress upon the adverse party, whether the other spouse has since died, or married again, whether there are children by such second marriage, whether the complainant has `accepted the benefits' of the divorce, such as alimony or by marrying again, whether or not the other spouse participated in the divorce, or acquiesced, whether complainant has been guilty of laches or undue delay, what the nature of the new suit is and the motive or object of complainant in bringing it; whether the complainant is an original party to the divorce action, or a child, or heir or representative, and the like."
Applying these standards, defendant places great reliance on plaintiff's alleged participation or acquiescence in the void divorce. The facts on which he depends are these:
During the latter part of 1944, while plaintiff was stationed at a naval depot, he was approached by a New York attorney who said he represented the wife and who requested him to sign a form acknowledging service and appearance in the Mexican court. Plaintiff refused until he had had an opportunity to talk to his wife. He spoke to her a month later, and she informed him she wanted a divorce. He then spoke to his New Jersey attorney, who told him that the wife had no grounds and if she obtained a Mexican divorce it would be invalid.
Decedent obtained her Mexican decree on December 18, 1944. She had not told plaintiff that she was prosecuting *448 a divorce action in Mexico, or informed him of the entry of the decree. Apparently the decree was obtained by a so-called "mail order" Mexican divorce proceeding. On January 6, 1945, plaintiff again conferred with his attorney and told him he was being shipped out to sea, that his wife wanted a divorce, and that he had received a form from her attorney which "they wanted me to sign." The two, accompanied by plaintiff's brother-in-law, then went to the wife's home where a discussion about the divorce ensued. Plaintiff testified that he told his wife, "If you want a divorce, if it will make you happy, O.K., but let me know when you get it." He then signed the form and left it with her. The form stated that he knew of the filing of the divorce action, acknowledged the existence of incompatibility between himself and his wife and a divorce should be granted for that reason, and submitted himself to the jurisdiction of the Mexican court. He authorized his attorney to receive notification of the divorce.
At the time plaintiff signed this form he was completely unaware that a decree had already been entered. His signature was thus obtained after entry of the decree and through the deceit of his wife. Her undoubted motive in obtaining this consent was to buttress the mail order divorce.
Plaintiff's conduct may have evinced an acquiescence in his wife's obtaining a divorce, but he did not participate in the Mexican divorce proceeding itself. His acquiescence was subsequent to the entry of the decree and must be sharply distinguished from any participation in the divorce. His conduct in no way led to the obtaining of the decree.
Equitable estoppel embodies the doctrine that one may not repudiate an act done or a position assumed where that course would work injustice to another who, having the right to do so, relied thereon. McAlpine v. Garfield, 25 N.J. Misc. 477, 480 (Cir. Ct. 1947), affirmed 137 N.J.L. 197 (E. & A. 1948). The essence of equitable estoppel is that one is precluded from taking a position inconsistent with that previously assumed and intended to influence *449 another's conduct, if such repudiation would not be responsive to the demands of justice and good conscience in that it would effect an unjust result as regards the latter. An essential element is that the party claiming the estoppel actually relied upon the conduct of the party said to be estopped, and because of such reliance changed his position, and this to his prejudice.
Defendant recognizes the need of showing reliance on plaintiff's conduct and a subsequent prejudicial change of position. It is urged that decedent married defendant on May 7, 1947, some 2 1/2 years after her Mexican divorce, and this change of position was in reliance on plaintiff's conduct which indicated he would not challenge a patently void decree  the kind of a divorce which plaintiff's attorney had explained would be of no validity whatever.
But does the evidence sustain the inference that decedent remarried in reliance on plaintiff's signing the purported appearance and his statement to the effect that if she wanted a divorce and it would make her happy, it was "O.K." with him? Was decedent lulled by plaintiff's conduct into believing that he would not challenge any Mexican divorce decree she might obtain? The answer must be in the negative. In the first place, plaintiff's conduct on January 6, 1945 was the direct result of fraud and deceit practiced by decedent in failing to disclose the fact that a divorce decree had already been entered in Mexico. This alone should be sufficient to preclude him from being estopped.
Second, although decedent did not remarry until some 2 1/2 years after the purported divorce, there existed an impediment to any earlier marriage. Defendant was a married man. His wife obtained a divorce against him in New York on the ground of adultery, defendant being represented by the same attorney who had obtained decedent's Mexican divorce. Defendant and decedent married within three days after the New York divorce became final. Incidentally, defendant admitted that the marriage had been planned while his wife's New York action was still pending. He *450 also admitted he knew of decedent's divorce when they applied for a marriage license; in fact, she produced her divorce papers at the time. He was therefore fully apprised of her decree being a Mexican one.
Third, decedent did not have a right to rely on plaintiff's conduct which, as we have said, was proximately induced by her failure to disclose the existence of her Mexican decree. Her only motivation for failing to disclose that fact and for wanting plaintiff to sign the invalid consent would be to reenforce the Mexican divorce, and this in the mistaken belief that she could rely on the consent in the event she had to do so in the future. It must therefore be concluded that decedent did not rely on plaintiff's conduct.
Defendant concedes that in the normal course of events plaintiff would have no duty to "clarify his marital status," or to speak or act. But it is argued that where a party participated, acquiesced in or consented to a divorce, and has otherwise lulled the other party into believing that no challenge would be made to the efficacy of that divorce, there arises a duty to speak or act before there is reliance. Suffice to say, the factual premise for such a contention does not exist here. Plaintiff did not participate, acquiesce in, or consent to the divorce so as to lull decedent into believing it would not be challenged. There being no justifiable reliance, there was no duty to speak or act.
Realistically viewed, the present partition dispute is between plaintiff and defendant, and there is absolutely no evidence that defendant married decedent in reliance on plaintiff's conduct. Nor can he be described as an innocent party. He was friendly with decedent and knew that she contemplated procuring a divorce. He was keeping company with her and planned to marry her as soon as he was finally divorced from his then wife. He knew of decedent's Mexican divorce. As the court stated in Tonti v. Chadwick, 1 N.J. 531, 536 (1949), referring to the duty of a person to inquire concerning the validity of a Mexican divorce:
*451 "* * * It is almost a matter of common knowledge that the prevalent `mail order' divorce is a nullity."
And in State v. De Meo, 20 N.J. 1, 14 (1955), a bigamy prosecution, the court noted that defendant had knowingly remarried on the basis of a Mexican mail order divorce and had taken no reasonable steps toward ascertaining the legal validity of that divorce. The court said:
"* * * the time is long past when a defendant may justly be heard to say in our courts that he reasonably and honestly held the belief that he was free to remarry on the basis of a Mexican mail order divorce."
Defendant further argues that plaintiff accepted all the benefits of the Mexican decree, for he did not support his wife or contribute to the expenses of her long illness, or attend her funeral or contribute to its cost. But it was decedent who obtained the divorce. She was not subject to fraud or duress. She voluntarily decided to separate herself from plaintiff and, as the trial court noted, in effect deserted him. Plaintiff's alleged acquiescence in the Mexican divorce  the result of her deception  does not change the picture. Under these circumstances, plaintiff was under no duty to support decedent. Indeed, she never requested support. After she had cohabited with defendant for some 11 years, and he had apparently adequately provided for all her needs, can it be said that plaintiff was duty-bound to then contribute to the expenses of her last illness? Such conduct would be strange indeed.
Plaintiff did not receive any of the benefits of the decree, as that phrase is used in our case law. He never remarried, nor did he take advantage of a property settlement. See Hollingshead v. Hollingshead, above, 91 N.J. Eq., at page 274.
Defendant contends that plaintiff took no action until decedent's death. But absent an estoppel or laches (to be discussed below), he was under no duty to do so. This is an action for partition of lands based on plaintiff's status *452 as decedent's lawful husband and heir at law. His right to claim his wife's estate did not arise until after her death, and he asserted his rights within a reasonable time thereafter. The thrust of defendant's argument seems to be that plaintiff's inaction deprived defendant of the benefit of decedent's testimony  testimony that might have been crucial. Manifestly, this action could not be brought until Mary's death, so that defendant could never have had the benefit of her testimony on the main issues involved herein.
The argument is made that plaintiff's motive in bringing this suit is economic gain or benefit, and therefore the court should lend him no aid or comfort. Untermann v. Untermann, 35 N.J. Super. 367 (App. Div. 1955), modified and affirmed 19 N.J. 507 (1955); 43 N.J. Super. 106 (App. Div. 1956), certification denied 23 N.J. 363 (1957), is cited in support. Involved there was relief from the payment of alimony or the like, and not the economic benefit to which a lawful heir is entitled, or to which a lawful husband is entitled by way of curtesy. In Untermann, 43 N.J. Super., at page 109, we noted that the doctrines of unclean hands and estoppel, insofar as they affected that case, were somewhat akin:
"* * * They are flexible in their application, turning largely on the circumstances involved in the * * * `total situation.' * * * They may turn, too, upon the relative innocence or culpability of the plaintiff and defendant, for the law may aid the one who is comparatively the more innocent. * * *"
Upon a consideration of the entire record, we conclude that plaintiff is not barred from maintaining this action by application of the equitable doctrines of estoppel and unclean hands.

II.
The trial court held that plaintiff was not guilty of laches, by computing the time lag from the date Mary died, September 22, 1958, to the date the amended complaint was filed, August 12, 1959, a period of about a year. (The original *453 complaint was filed March 14, 1959.) Defendant does not claim that this one-year delay constitutes laches. Rather, he argues that the period of plaintiff's unreasonable and unexplained delay must be computed from the date when he learned of the entry of the divorce decree to the date of the commencement of this action. Plaintiff knew nothing of decedent's having obtained a divorce until he returned home about November 1, 1945, following his discharge from the navy. Only then did she tell him they were divorced, and when he asked why he had not been notified, she said, "See my lawyer." Repeated attempts to determine from his wife's New York attorney when and where the alleged divorce had been obtained proved unsuccessful. Plaintiff learned of the existence of the Mexican divorce only after he had communicated with the Bureau of Navy Personnel to inquire why decedent had received his allotment checks if she had in fact divorced him.
The trial court's holding on the question of laches was correct. Plaintiff's inaction between the time he learned of the entry of the divorce decree and the commencement of this suit is relevant only to the defense of estoppel.
The rationale of the doctrine of laches is said to be the policy which requires, for the peace of society, the discouragement of stale demands. 19 Am. Jur., Equity, § 492, p. 340 (1939). It is the equitable counterpart of statutes of limitation. The adjudicated cases "proceed on the assumption that the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless or have been abandoned; and that, because of the change in condition or relations during this period of delay, it would be an injustice to the latter to permit him now to assert them." Galliher v. Cadwell, 145 U.S. 368, 372, 12 S.Ct. 873, 36 L.Ed. 738 (1891).
We had occasion to discuss the doctrine of laches in Auciello v. Stauffer, 58 N.J. Super. 522, 529 (App. Div. *454 1959), where we quoted from Bookman v. R.J. Reynolds Tobacco Co., 138 N.J. Eq. 312, 406 (Ch. 1946):
"It is the rule that the defense of laches depends upon the circumstances of each particular case. Where it would be unfair to permit a stale claim to be asserted, the doctrine applies. * * *"
Laches can be a defense only where there is a delay, unexplained and inexcusable, in enforcing a known right and prejudice has resulted to the other party because of such delay. Mitchell v. Alfred Hofmann, Inc., 48 N.J. Super. 396, 403 (App. Div. 1958), certification denied 26 N.J. 303 (1958).
We must not lose sight of the fact that the right which plaintiff is asserting is his right as decedent's surviving husband and sole heir to have a partition of certain real property. This right could not be asserted prior to her death, and therefore laches can be computed only from that date.
Defendant relies upon Lawler v. Lawler, 2 N.J. 527 (1949). An examination of that case and others like it dealing with laches, reveals that in each instance the moving party attempted to assert a right which could have been claimed earlier, and that the period of laches was computed by considering the first moment in time when such right could have been asserted. We have emphasized that the earliest plaintiff could have brought this action was immediately after Mary's death. He acted within six months  or, taking the date of the amended complaint, within a year. It is not even argued that this time lag constituted laches. Moreover, no prejudice is shown. We therefore hold that laches is no bar to plaintiff's maintaining this suit.

III.
Defendant now raises for the first time the point that even if defendant and decedent were not lawfully married, the trial court should have considered the estate as a joint tenancy *455 with survivorship in defendant, rather than one in common, as plaintiff insisted.
Defendant's brief fails to note that this question was not presented to the court below, and thus violates the mandate of R.R. 1:7-1(c). It is fundamental that appellate courts will not consider questions not presented below unless they relate to matters of jurisdiction or public concern. Foster v. New Albany Machine & Tool Co., 63 N.J. Super. 262, 268 (App. Div. 1960). See Ex-Cell-O Corp. v. Farmers Coop. Dairies Ass'n, 28 N.J. Super. 159, 161 (App. Div. 1953), for a discussion of the rationale underlying this salutary rule. Defendant is barred from raising the joint tenancy issue for the first time on this appeal.
In any event, defendant's contention is without merit. As we have already indicated, this is not a case in which the defendant may be characterized as being innocent and acting in good faith. Laches and estoppel are not available to him. Whatever the rule in other jurisdictions, ours is contrary to the argument he presently makes. See Danes v. Smith, 30 N.J. Super. 292, 301 (App. Div. 1954).

IV.
Defendant also raises for the first time on appeal the question of the existence of a resulting trust. For the reasons just stated, he is barred from now raising this issue. Moreover, the contention is not a valid one.
The argument made is that since defendant paid the entire purchase price for the unimproved lot taken in his and Mary's name, a resulting trust should be declared. The general rule is that a resulting trust will be raised in favor of the one paying the purchase price of property transferred to another unless it is shown that the payor manifested an intention that no resulting trust should arise. Weisberg v. Koprowski, 17 N.J. 362, 371 (1955), and the authorities there cited. However, where one of certain relationships  usually of blood or marriage  exists between the *456 payor and the transferee, the inference to be drawn is not one of resulting trust but of gift or advancement, and the burden is upon him who claims the resulting trust to show that the payor manifested an intention that the transferee should not have the beneficial interest in the property. Ibid., 17 N.J., at page 372. But, as pointed out in Weisberg, the rule inferring a gift to a transferee related to the payor is not to be determined on considerations of the closeness of the relationship or the extent of natural affection, or by reason of any legal obligation to furnish support. The modern test is whether the relationship is such as to constitute the transferee the natural object of the payor's bounty. If so, the inference is one of gift and not resulting trust. Ibid., 17 N.J., at pages 372-373, and authorities there reviewed. The essential inquiry is whether it is probable that the payor intended to make a gift to the transferee or that it would be natural to make provisions for his advancement.
Whether the payor and transferee are legally married is immaterial. It is quite evident that defendant considered decedent the natural object of his bounty. It is probable, under the circumstances disclosed by the record, that he intended a gift. He believed decedent was his wife and in all respects treated her as such. We therefore find his claim of resulting trust completely without merit.

V.
Defendant next contends that plaintiff, claiming as the heir of his spouse, cannot assert a claim or take a position which she would have been estopped from asserting or taking. There can be no question but that decedent would be estopped from collaterally attacking the validity of the Mexican divorce decree which she herself obtained. But does this mean that her rightful heirs may be deprived of their statutory rights to an inheritance because of conduct on her part not related to the title to the realty they will receive?
In 31 C.J.S., Estoppel, § 132, p. 399, it is stated:
*457 "An heir stands in privity with the ancestor; and an estoppel in pais enforceable against the ancestor is likewise enforceable against the heirs. However, the heirs are not estopped where the elements of equitable estoppel are not present, and they are not bound by an estoppel against the ancestor where they do not claim in the same right." (Italics ours)
This is not a controversy between the heirs and a third party, wherein the heirs claim some derivative right from the ancestor. Rather, this is a contest between the survivors themselves for the purpose of determining which one is the lawful heir. See Brandt v. Brandt, 76 Ariz. 154, 261 P.2d 978, 982 (Sup. Ct. 1953). See also, Peoples National Bank v. Manos Bros., 226 S.C. 257, 84 S.E.2d 857, 45 A.L.R.2d 1070 (Sup. Ct. 1954), to the effect that an inflexible rule that wherever a decedent would have been estopped to question the validity of a divorce obtained by him or with his help, his heirs are likewise estopped, would open the door to fraudulent divorce proceedings, validating them against a wife and children, however innocent, and require ratification of the decedent's conduct.
In re Flasch, 51 N.J. Super. 1 (App. Div. 1958), certification denied 28 N.J. 35 (1958), is not to the contrary. That case merely held that decedent's executors, not his heir, were estopped from asserting a claim of curtesy which decedent had manifestly waived in favor of his children. Likewise, in Hynes v. Title, etc., Co., 273 N.Y. 612, 7 N.E.2d 719 (Ct. App. 1937), the court held that a husband's personal representative was estopped from raising the invalidity of a foreign divorce decree obtained by decedent from his first wife, in a suit by the second wife to enforce dower. In Alburger v. Crane, 5 N.J. 573 (1950), also relied on by defendant, the suit was to set aside certain conveyances of real estate. The estoppel of the husband in that case was imputed to his wife in her capacity as executrix and as devisee; clearly, the wife was claiming in the same right as her husband.
In the present case, plaintiff is not derivatively asserting his ancestor's right to the property in question. Her title *458 is beyond dispute. Plaintiff is merely attempting to establish his rights as a lawful heir. We are cited to no authority for the proposition that an individual like plaintiff may, in the circumstances such as are here present, be estopped to assert his rights as a lawful heir because his ancestor would be estopped from collaterally attacking a void divorce decree.
We therefore hold that plaintiff is not estopped from asserting his rights on the ground that decedent would herself be estopped from collaterally attacking her void Mexican decree.

VI.
Defendant's counterclaim sought relief in the nature of "contribution, exoneration and reimbursement" for certain sums expended by him after he married decedent. The trial court divided his expenditures into three classes: (1) those made for the maintenance and upkeep of the property prior to the creation of the tenancy in common by the December 1952 bargain and sale deed of Mary Maller and her husband to "Charles Maller and Mary Maller, his wife"; (2) those made for the maintenance and upkeep of the property after that date; and (3) those made for decedent's support and maintenance and for the expenses of her last illness and funeral. The trial judge ruled that defendant was entitled to reimbursement out of the proceeds of the partition sale as to the second category, and also for decedent's funeral expenses. However, defendant's claim for the cost of the monument which he ordered and erected, inscribed with the name "Mary Maller," was denied.
Defendant argues that to limit his recovery for expenditures made in connection with the properties to only those incurred subsequent to the existence of the cotenancy would be to unjustly enrich plaintiff. The most that can be said for this argument is that defendant paid out monies on the property prior to the tenancy in common, supported and maintained decedent, and paid the expenses of her last illness under the assumption that she was his lawful wife. *459 In all this, his position was that of a mere volunteer. The advances he made constituted gifts from him to her, or were made for her benefit and presumably prompted by his affection for her.
We see no more reason to impress a lien on the property in defendant's favor for the expenses of the last illness than for the monies expended by him to support decedent during the 11 years they cohabited. Surely he could not recoup monies spent for decedent's support on a claim that plaintiff was obliged to support her.
Defendant claims that the payments to maintain the property, as well as those for medical expenses during decedent's last illness, were made under a mistake of fact. It could with equal force be argued that he supported her for 11 years under a mistake of fact, to plaintiff's unjust enrichment.
The crux of the matter is that all of the payments were made by defendant as a volunteer, albeit under a mistake of law  not a mistake of fact. The general rule is that payments made under a mistake of law or in ignorance of law, but with full knowledge of the facts, cannot be recovered, absent fraud or improper conduct on the part of the payee, 70 C.J.S., Payment, § 156, p. 362 (1951). Although it is sometimes difficult to distinguish between mistake of law and of fact, a mistake of law occurs where a person is truly acquainted with the existence or non-existence of facts, but is ignorant of or comes to an erroneous conclusion as to their legal effect. Ibid., § 156(c), p. 366; 40 Am. Jur., Payment, § 207, p. 857 (1942).
Defendant was fully aware of all the facts. He was mistaken only as to their legal effect. Moreover, in view of the fact that he knew of the Mexican mail order decree, it is questionable whether his mistake could be justified under any circumstances.
Although the trial court recognized the rule that a husband is liable for the reasonable funeral and burial expenses of his wife, regardless of her misconduct, see *460 Stryker v. Sands, 4 N.J. 182, 188 (1950), he properly did not permit reimbursement for the monument ordered by defendant. Such a monument does not constitute part of a "suitable burial." There is no public interest in marking graves with monuments. Of course, the monument defendant erected memorialized decedent as his wife. Surely plaintiff should not be required to pay for this.
We consider the trial court's disposition of defendant's various claims for reimbursement as entirely correct.
The judgment is affirmed.