988 A.2d 114 (2010)
411 N.J. Super. 538
Dean SMITH, on behalf of himself and all others similarly situated, Plaintiff-Appellant,
v.
HUDSON COUNTY REGISTER and Willie J. Flood, in his capacity as the Hudson County Register and Hudson County, through the Hudson County Board Of Chosen Freeholders, Defendants-Respondents.
James Gensch, on behalf of himself and all others similarly situated, Plaintiff-Appellant,
v.
Hunterdon County Clerk's Office and Mary H. Melfi, in her capacity as the Hunterdon County Clerk, and Hunterdon County, through the Hunterdon County Board of Chosen Freeholders, Defendants-Respondents.
Martin O'Shea, on behalf of himself and all others similarly situated, Plaintiff-Appellant/Cross-Respondent,
v.
Sussex County Clerk's Office and Erma Gormley, in her capacity as the Sussex County Clerk, Sussex County, and the Sussex County Board of Chosen Freeholders, Defendants-Respondents/Cross-Appellants.
Nos. A-1762-08T2, A-2507-08T3, A-2518-08T3.
Superior Court of New Jersey, Appellate Division.
Argued September 16, 2009.
Decided February 10, 2010.
*118 Sander D. Friedman and Wesley G. Hanna, West Berlin, argued the cause for appellant Dean Smith in A-1762-08T2, appellant James Gensch in A-2507-08T3 and appellant/cross-respondent Martin O'Shea in A-2518-08T3 (Friedman Doherty, LLC, attorneys; Mr. Hanna, on the brief).
Steven L. Menaker, Secaucus, argued the cause for respondents Hudson County Register, Willie J. Flood and Hudson County in A-1762-08T2 (Chasan Leyner & Lamparello, PC, attorneys; Mr. Menaker, of counsel; Mr. Menaker and Kirstin Bohn, on the brief).
Michael A. De Sapio, argued the cause for respondents Hunterdon County Clerk's Office, Mary H. Melfi, and Hunterdon County in A-2507-08T3 (Mr. De Sapio and Gaetano M. De Sapio, Frenchtown, on the brief).
Robert B. Campbell, argued the cause for respondents/cross appellants Sussex County Clerk's Office, Erma Gormley, Sussex County, and the Sussex County Board of Chosen Freeholders in A-2518-08T3 (McConnell, Lenard & Campbell, LLP, attorneys, Stanhope; Dennis R. McConnell, of counsel; Mr. Campbell, on the brief).
Daniel O'Mullen, Morris County Counsel, and Michael E. Hubner, Special County Counsel, for amicus curiae Morris County Clerk's Office (Mr. O'Mullen and Mr. Hubner, of counsel; James T. Bryce, on the brief).
Eric M. Bernstein & Associates, L.L.C., Warren, for amici curiae Passaic County Clerk, Karen Brown and Passaic County Clerk's Office (Eric Martin Bernstein, of counsel; Mr. Bernstein and Philip G. George, on the brief).
Thomas F. Kelso, Middlesex County Counsel, attorney for amici curiae Middlesex County Clerk's Office, Middlesex County Clerk, Elaine Flynn, and Middlesex County (Benjamin D. Leibowitz, Deputy County Counsel, on the brief).
Chasan Leyner & Lamparello, PC, Secaucus, for amici curiae Hudson County, Hudson County Register, Willie J. Flood, Mercer County Clerk's Office, Mercer County Clerk, Paula Sollami-Covello, and Mercer County (Steven L. Menaker, of counsel; Mr. Menaker and Kirstin Bohn, on the brief).
Before Judges STERN, GRAVES and SABATINO.
The opinion of the court was delivered by
SABATINO, J.A.D.
In these three back-to-back appeals, which we hereby consolidate for purposes of this opinion, plaintiffs each argue that *119 the trial court erred in dismissing their respective and similar lawsuits against three defendant Counties (Hudson, Hunterdon, and Sussex) and various officials and sub-units of those Counties. Plaintiffs are all represented by the same law firm. They contend that defendants have overcharged them, and overcharged other members of the public, for the copying of government records maintained at County offices, in violation of both the Open Public Records Act ("OPRA"), N.J.S.A. 47:1A-1 to -13, and the common law. Defendants, joined by four other Counties (Morris, Middlesex, Mercer, and Passaic) appearing as amici curiae, assert that their copying charges comport with OPRA and the common law. Defendants also contend that plaintiffs' lawsuits are procedurally flawed in numerous respects.
For the reasons stated herein, we reverse the trial court's orders denying relief in all three cases. We hold that unless and until the Legislature amends OPRA to specify otherwise, or some other statute or regulation applies, the Counties must charge plaintiffs and other similar requestors of government records no more than the reasonably approximated "actual costs" of copying such records. The burden of proving or disproving compliance with that "actual costs" mandate will vary, depending upon whether the charges in question exceed certain fee levels identified in the second sentence of N.J.S.A. 47:1A-5(b).
Because of the fiscal and administrative impacts upon the Counties and other governmental agencies that are likely to result from this holding, we give our decision only prospective effect and delay its effective date until after the current State fiscal year.

I.
The facts and procedural history of these three cases, which turn on questions of law and statutory interpretation, are mainly undisputed.
The Hudson County ("Smith") Litigation (A-1762-08).
Plaintiff in A-1762-08, Dean Smith, is a private investigator. As part of his work as an investigator, Smith searches government records kept at the offices of County government agencies. At times, Smith needs to obtain copies of those records. According to Smith's complaint, on three separate dates (August 1, 2007; October 3, 2007; and August 22, 2008), he copied deeds on the self-serve photocopiers provided at the Hudson County Register's Office. Depending on the age of the deed, such copies are made by either using self-service copiers or by printing a digitized image from a computer. In either instance, Hudson County charges $0.25 per page for such copies. Smith suspected that the $0.25 charge exceeded the County's actual expense in producing the copies. Nevertheless, Smith paid the charges, apparently without making any contemporaneous protest.
On October 23, 2007, Smith filed a class action complaint in the Law Division against the Hudson County Clerk's Office, contesting the fees charged to reproduce government records on the County's self-service copiers and printers. Smith sought to certify the class, which would include all persons who had made copies or printouts at the Hudson County offices and had likewise paid the County $0.25 per page. He also sought a court-ordered mathematical determination of the County's actual costs in making the copies. Because Smith had mistakenly named improper defendants, he subsequently amended his complaint to assert the same claims against the Hudson County Register, Willie J. Flood, and Hudson County *120 through its Board of Freeholders (collectively "the Hudson defendants").
The trial court denied Smith's motion to certify the class, finding that he procedurally had no claim because he had voluntarily paid Hudson County the $0.25 copying fee. Given that ruling, the court found it unnecessary to ascertain Hudson County's actual costs of copying.
Smith filed a motion for reconsideration. The trial court denied it, and also dismissed his complaint. Smith then filed his present appeal.

The Hunterdon County ("Gensch") Litigation (A-2507-08).
James Gensch, plaintiff in A-2507-08, is a homeowner who resides in Hunterdon County. According to Gensch, he was interested in finding out whether and to what extent his property was encumbered by any easements. Consequently, on April 27, 2007, Gensch went to the Hunterdon County Clerk's Office to obtain a copy of his deed.
For records filed prior to October 2000, Hunterdon County maintained bound volumes with the Registry of Deeds. The contents of those volumes could be reproduced on self-serve copiers located in the County offices. However, deeds recorded in Hunterdon County after October 2000 were only available as digitized images viewable from computers, and copies could be made on attached printers. Hunterdon County charged $0.25 for such copies, whether they were reproduced on the self-serve copiers or on the digital printers.
On May 8, 2007, Gensch filed a complaint in the Law Division against the Hunterdon County Clerk's Office, the County Clerk, and Hunterdon County ("the Hunterdon defendants"), asserting that the costs they had charged him for self-serve photocopying were excessive. After the Hunterdon defendants answered, Gensch filed a motion for class certification. He also sought to determine Hunterdon County's actual costs of making copies. The trial court granted the motion to certify the class. However, the court found it premature to determine the County's actual costs of making copies because additional data was needed.
The Hunterdon defendants then filed with the court a summary of items they believed were necessary to determine actual costs. Gensch, meanwhile, re-filed his motion to compel a determination of actual costs.
On April 15, 2008, the trial court ruled that the components of Hunterdon County's actual costs of copying consisted of: (1) paper, (2) toner or ink, (3) cost of acquiring the self-service equipment, (4) maintenance contract, (5) repairs not covered by the contract, (6) electricity used in the copying and printing process, and (7) time spent on computer terminals. Neither party disputed this breakdown of the cost components.
The parties in the Hunterdon action cross-moved for summary judgment. As part of the summary judgment record, the Hunterdon defendants certified that the total number of copies made on the self-serve copiers and printers between May 2001 and August 2008 was 1,598,563, and that the total amount the County collected for such copying was $399,640.74. They indicated that the County's actual per-page cost was $0.07, but when the costs of the computer equipment and imaging system were factored into the analysis, the County's per-page cost was $0.31. If Hunterdon County had charged only $0.07 per copy, the total amount charged would have been $111,899.41. Consequently, based on these calculated figures, Gensch alleged that Hunterdon County had overcharged persons by $287,741.33.
*121 After considering the parties' contentions, the trial court entered judgment for the Hunterdon defendants, finding that $0.25 per page was permitted by OPRA and by extant case law. Thereafter, Gensch filed a notice of appeal.

The Sussex County ("O'Shea") Litigation (A-2518-08).
The third case before us, A-2518-08, was filed in the Law Division in Sussex County by Martin O'Shea, a retired newspaper reporter. O'Shea frequently searches real estate records in the Sussex County offices. To obtain duplicates of such records, he could either photocopy them using self-serve copying machines at the County offices or print digital records using computer printers. On November 9, 2006, O'Shea made self-serve copies at the Sussex County offices, and was charged $0.25 per page.
From March 1985 through December 2006, a private entity, the Sussex County Abstractors Partnership ("SCAP"), maintained the self-service copiers at the Sussex County offices, pursuant to an agreement with the Sussex defendants. Although from November 2000 through December 2006, SCAP charged customers $0.25 per page for copies made on its equipment, it only paid Sussex County $0.08 per page, which essentially represented space rental and electricity. After paying for supplies, SCAP divided the excess profit among its members.
In January 2007, SCAP transferred ownership of the copying machines to Sussex County. Thereafter, in April 2007, Sussex County lowered the price per copy to $0.10 per page. Customers generally made more than 20,000 copies per month on the self-service copiers.
In 2007, Sussex County purchased the computer printers for a total of $11,683.28. Approximately 250,668 computer printouts are produced on these printers every year. After all of the components for printing were accounted for, O'Shea calculated that the actual costs to the Sussex defendants for computer-generated copies were $0.03 per page and $0.02 per page for self-serve copies.[1]
On November 15, 2006, O'Shea filed a class action complaint in the Law Division against the Sussex County Clerk's office, Sussex County, and the Sussex County Clerk (the "Sussex defendants"). O'Shea filed a motion for class certification and also sought a determination of the County's actual copying costs. On May 25, 2007, the trial court granted O'Shea's motions. The court determined that the expenses that make up actual costs consisted of: (1) paper, (2) toner/ink, (3) the cost of the self-service equipment, and (4) electricity used in the copying and printing process.
Based on the trial court's initial determinations, O'Shea calculated what he believed to be the actual costs of the copies. He moved for summary judgment, contending that he and the other class members had been overcharged. The Sussex defendants, in turn, cross-moved for summary judgment, contending that their copying charges were consistent with OPRA and the applicable case law.
On December 10, 2008, the trial court granted the Sussex defendants summary judgment, dismissing O'Shea's complaint. O'Shea appealed. The Sussex defendants cross-appealed, seeking to preserve certain *122 defenses and arguments that had not been decided by the trial court.

The Participation of Other Counties as Amici.
While these three appeals were all pending, we granted motions by the Morris County Clerk's Office ("Morris"), the Passaic County Clerk's Office ("Passaic"), the Mercer County Clerk's Office ("Mercer"), and the Middlesex County Clerk's Office ("Middlesex"), to appear as amici curiae, all of whom had cases pending with similar facts and issues.[2] In addition, we granted a motion by the Hudson defendants to appear as amicus curiae in the two related cases from Hunterdon and Sussex, in which they were not named defendants.

II.
Before we examine the merits of these appeals, we address a procedural argument raised by defendants solely in Smith and Gensch: namely, whether those two particular plaintiffs are estopped from challenging the Counties' respective copying charges because they allegedly "volunteered" payment of those charges.[3] We reject that argument, essentially because it misconceives the adhesive setting in which Smith, Gensch, and other citizens obtain photocopied records from the County offices.
The "volunteer rule" is an equitable doctrine that has been developed to limit the circumstances in which a party can be forced to repay funds that it has already received. The rule generally provides that when a person has voluntarily overpaid another party, particularly a government agency, that person may not obtain a refund of the excessive amount, absent a showing of fraud, duress, extortion, mistake of fact, or some other special justification. See, e.g., Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329, 334, 173 A.2d 258 (1961); Squires Gate, Inc. v. County of Monmouth, 247 N.J.Super. 1, 10, 588 A.2d 824 (App.Div.1991).
For example, in N.J. Builders Ass'n v. Borough of Mendham, 263 N.J.Super. 88, 621 A.2d 985 (App.Div.1993), a case relied upon by both the Hudson and Hunterdon defendants, five builders wanted to connect their new construction to Mendham's water supply system. Id. at 91, 621 A.2d 985. Mendham overcharged the builders in order to raise funds to improve the municipal system. Ibid. The builders paid those inflated fees, even though they had other options. Id. at 92-93, 621 A.2d 985. After the inflated fees had been declared invalid, the builders sought to recover the sums they had paid, which the trial court granted. Id. at 93, 621 A.2d 985. We reversed and remanded the matter, allowing the borough to present evidence to support its reliance on the volunteer payment rule. Id. at 96, 621 A.2d 985. We reasoned that if the builders had voluntarily paid the connection fee knowing they had other options for connecting to a water supply, they would be barred from recovering the overpayment. Id. at 95, 621 A.2d 985. We also noted that the builders had not paid the sums under duress, and had not contemporaneously protested. Ibid.
*123 In Flammia v. Maller, 66 N.J.Super. 440, 444, 169 A.2d 488 (App.Div.1961), another key case that defendants cite on this issue, the defendant married a woman who previously had been married to the plaintiff. The woman had divorced the plaintiff in Mexico without his knowledge. After the woman died, the court permitted the plaintiff to inherit from her estate as her lawful husband, finding the Mexican divorce a nullity. Ibid. The defendant argued that the plaintiff should also be liable for the decedent's support during the years following the invalid Mexican divorce, when she had cohabited with the defendant. Id. at 458, 169 A.2d 488. We rejected that argument. We held that the defendant could not recover from the plaintiff because the defendant had supported her in full knowledge of the facts, even though he had made a mistake of law in not appreciating the invalidity of the Mexican divorce. Id. at 459, 169 A.2d 488. The defendant had supported the decedent out of affection for her, and his support was therefore considered a voluntary gift. Ibid. Consequently, recovery of the support payments from the plaintiff was barred by the voluntary payment rule. Ibid.
The present circumstances are not comparable. To be voluntary, a payment must be made with knowledge that there is no compulsion to pay. Jenkins v. Kaplan, 53 N.J.Super. 582, 588, 148 A.2d 33 (App.Div.1959). Here, Smith, Gensch and other citizens requesting copies of government records from defendants had no realistic choice but to pay the respective County's stated fee in order to obtain such copies. The fee was non-negotiable.
Moreover, the record is barren of proof that either Smith or Gensch knew the pertinent County's actual costs of reproduction when they obtained their copies. Although they clearly had a strong suspicion that the fee charged by the County exceeded the actual costs involved, they did not know that for certain. Plaintiffs may well be "test-case" litigants, but they are not volunteers estopped from obtaining a remedy for a proven government overcharge.
Nor were plaintiffs obligated to lodge a formal protest with the defendant Counties before filing suit. Nothing in New Jersey Builders, supra, requires such a protest, at least where the failure to protest arises not from economic factors but instead from "actions of the government agency." Id. at 95, 621 A.2d 985. We suspect that such a formal protest here would have been futile, in light of the Counties' strong and persistent defense, both at the trial level and on the present appeals, of the legality of their copying fees.
For these reasons,[4] we reverse the trial court's application of the voluntary payment rule in Smith, and further reject the Hunterdon defendants' invocation of that rule in Gensch.

III.
We now turn to the substance of these appeals. The critical statutory provision implicated here is N.J.S.A. 47:1A-5(b), which has been part of the OPRA statute and remained unaltered since its adoption in 2002. The four sentences of Section 1A-5(b) read as follows:
A copy or copies of a government record may be purchased by any person upon payment of the fee prescribed by law or *124 regulation, or if a fee is not prescribed by law or regulation, upon payment of the actual cost of duplicating the record. Except as otherwise provided by law or regulation, the fee assessed for the duplication of a government record embodied in the form of printed matter shall not exceed the following: first page to tenth page, $0.75 per page; eleventh page to twentieth page, $0.50 per page; all pages over twenty, $0.25 per page. The actual cost of duplicating the record shall be the cost of materials and supplies used to make a copy of the record, but shall not include the cost of labor or other overhead expenses associated with making the copy except as provided for in subsection c. of this section.[5] If a public agency can demonstrate that its actual costs for duplication of a government record exceed the foregoing rates, the public agency shall be permitted to charge the actual cost of duplicating the record.
[N.J.S.A. 47:1A-5(b).]

A.
Section 1A-5(b) of OPRA has its roots in the Right to Know Law ("RKL"), which was part of the Public Records Act of 1963. In January 1963, various sponsors introduced Assembly Bill 344, a bill designed, among other things, to codify certain aspects of Moore v. Bd. of Chosen Freeholders of Mercer County, 39 N.J. 26, 30-31, 186 A.2d 676 (1962). The plaintiffs in Moore were taxpayers, political candidates, and other citizens who had sought to inspect and photocopy certain government records on file in Mercer County. The Supreme Court ruled that the plaintiffs were not entitled under the common law to make duplicates of those official records with their own photocopying machines, given the risks of the originals being damaged or destroyed during such copying. Id. at 30, 186 A.2d 676. However, the Court did find that the government was obligated to copy the records for the plaintiffs "at a reasonable cost," a sum which ordinarily should not include labor costs. Id. at 30-31, 186 A.2d 676.
Attempting to codify these principles after Moore, Assembly Bill 344 stated, in its original version, that:
Every citizen of this State shall also have the right during such regular business hours and under the supervision of a representative of the custodian, to copy such records by hand or, if approved by the custodian, by a photographic process specified by the custodian. The custodian of any such records may, to prevent the risk of damage or mutilation thereof, refuse to permit a citizen to photograph records, provided such custodian agrees to make and supply photographic copies thereof to the citizen upon payment of a reasonable fee therefor which shall approximate actual cost and which, except as otherwise specified by law, shall not exceed 50 cents per page or part thereof.

[Assem. B. 344, 190th Leg. Sess. (1963) (emphasis added).]
On February 4, 1963, the Assembly amended the bill by adding the following underlined language, and omitting the language contained in brackets:
... upon payment of a reasonable fee therefor, to be fixed by regulation of the board, body, agency, department, commission, authority or officer having such records which [shall approximate actual cost and which] except as otherwise *125 specified by law, shall not exceed 50 cents per page or part thereof for single copies; lower fees not to exceed 40 cents per page or part page may be fixed for 10 or more copies.
[Id. (First Official Copy Reprint).]
On February 11, 1963, the Assembly subsequently omitted the term "reasonable" from the section.
These various changes removed the bill's requirements that the copying fee must approximate an agency's actual cost and that the fee be reasonable. Instead, the revised bill permitted the fee to be set by the governmental custodian, so long as it did not exceed the price guidelines expressed in the statute.
On March 11, 1963, the Assembly again amended the bill omitting the following language:
to be fixed by regulation, of the board, body, agency, department, commission, authority or officer having such records which, except as otherwise specified by law, shall not exceed 50 cents per page or part thereof for single copies lower fees not to exceed 40 cents per page or part page may be fixed for 10 or more copies.
[Id. (Third Official Copy Reprint) (emphasis and bracketed material omitted).]
and, instead, adding this text in its place:
which except as otherwise provided by law, is fixed at 50 cents per page or part page; a fee of 40 cents per page or part page for 10 or more copies of the same page or part page may be fixed by regulation of the officer or department head or by resolution of the board, body, agency, commission, or authority, having such records.
[Ibid.]
The bill was passed by the Assembly on March 18, 1963, and by the Senate on April 22, 1963.
On May 6, 1963, Governor Richard J. Hughes vetoed the RKL. He returned the legislation to the Assembly, with the following comments objecting to the bill's allowance of copying by a citizen's own equipment:
There is, however, an aspect of this bill that requires clarification. Assembly Bill No. 344 provides that any person can photocopy, with his own equipment, any or all of the public records of government unless the custodian shall find that there is a risk of damage or mutilation of such records in which case copies must be made and supplied to such person at the rate of $0.50 per page with a lower rate for quantity purchases. This places on the custodian the unreasonable burden of accommodating as many persons and their equipment as may wish to reproduce public records unless he can sustain a finding that such equipment constitutes a risk to such documents. In addition, it would encourage commercial enterprises to reproduce governmental material and information in wholesale quantities because of the low cost involved. Much of this data undoubtedly would have been obtained at great cost to the governmental agency involved. It is not necessary to the stated public purposes of this bill to so disregard the rights and responsibilities of governmental officials.

[Veto Message of Governor Richard J. Hughes with Regard to Assembly Bill No. 344 (May 6, 1963) (Emphasis added).]
Governor Hughes suggested that the following alternative language be incorporated into the bill:
Copies of records shall be made available upon the payment of such price as shall be established by law. If a price *126 has not been established by law for copies of any records, the custodian of such records shall make and supply copies of such records upon the payment of the following fees which shall be based upon the total number of pages or parts thereof to be purchased without regard to the number of records being copied:
First page to tenth page .. $0.50 per page, Eleventh page to twentieth page. [$]0.25 per page, All pages over twenty. [$]0.10 per page.
If the custodian of any such records shall find that there is no risk of damage or mutilation of such records and that it would not be incompatible with the economic and efficient operation of the office and the transaction of public business therein, he may permit any citizen who is seeking to copy more than 100 pages of records to use his own photographic process, approved by the custodian, upon the payment of a reasonable fee, considering the equipment and the time involved, to be fixed by the custodian of not less than $5.00 or more than $25.00 per day.
[Id. at 2.]
On the same day, the Assembly amended the bill to reflect the above-quoted language suggested by Governor Hughes. This amended version was reenacted by the Assembly on May 6, 1963, reenacted by the Senate on May 13, 1963 and signed by Governor Hughes on June 7, 1963. Under this revised version of the statute, the highest price that could be charged for a copy of a government record was $0.50 per page.
There was no requirement in the RKL, as enacted, that a fee be related to a government agency's actual duplication costs. There was also no avenue in the RKL for a public agency to recoup amounts expended in duplicating a record if the duplication cost it more than $0.50 per page.
The RKL was subsequently displaced more than three decades later by OPRA.[6] OPRA's enactment began in January 2000, when Assemblymen Geist and Collins introduced Assembly Bill No. 1309 ("A-1309"). The bill generally sought to expand the rights of citizens to gain access to government records. Senators Martin and Baer introduced parallel legislation, Senate Bill No. 2003 ("S-2003"). The new proposed legislation created a "Government Records Council." It also defined more clearly which documents were considered government records subject to public access.
As initially proposed, the pertinent part of the bill read as follows:
A copy or copies of a government record may be purchased by any person upon payment of the fee prescribed by law or regulation, or if a fee is not prescribed by law or regulation, upon payment of the actual cost of duplicating the record. Except as otherwise provided by law or regulation the fee assessed for the duplication of printed matter shall not exceed the following: first page to tenth page, $0.75 per page; eleventh page to twentieth page, $0.50 per page; all pages over twenty, $0.25 per page. The actual cost of duplicating the record shall be the cost of materials and supplies used to make a copy of the record, but shall not include the cost of labor or other overhead expenses associated with making the copy. If a public agency can show that its actual costs for duplication of a government record exceed the foregoing *127 rates, the public agency shall be permitted to charge the actual cost of duplicating the record.
[Assem. B. 1309, 209th Leg. Sess. (2000).]
Section 2 of the new bill broadly defined a "government record" as:
any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound recording or in a similar device or any copy thereof ...[.]
[Ibid.]
With respect to the issue of copying charges, the Sponsors Statement for S-2003 recited:
The per page fee for the purchase of a copy of a government record is set forth in the bill. Different fees for the purchase of a copy of a record may be established by another statute or by regulation. An agency may charge the actual cost of duplicating a record when the actual cost exceeds the rates set forth in the bill. Additional charges may apply when copying involves an extraordinary expenditure of time and effort.
[S.B. 2003, 209th Leg. Sess. (2000).]
In a precursor to S-2003, Senator Baer co-sponsored a bill with Senators Kenny and Kyrillos, known as Senate Bill No. 351 ("S-351"). S-351 contained the following pertinent language:
With respect to requests for copies of records kept on computer media, film, or in any other form which cannot be photocopied, the price charged for copies of such records shall not exceed the reasonable cost which has been incurred by the public agency in making the copy. For the purposes of this section, "reasonable cost" shall mean a fee established by the public agency following guidelines established by the State Records Committee pursuant to section 5 of (this bill) to reimburse it for its actual cost in making such records available, including the cost of the time and personnel required to compile and produce the copy or copies.
If the record is maintained for the public agency by an entity other than the public agency, the contract between the public agency and the custodial entity shall specify that the custodial entity may only charge the reasonable cost incurred by that entity to make the copy. If requested by the purchaser, the public agency or custodial entity shall set forth in writing the basis on which the reasonable cost has been determined.

[S.B. 351, 209th Leg. Sess. (2000) (emphasis added).]
Although S-351 was not enacted as part of OPRA, its references to "actual cost" and "reasonable cost" shed light upon the copying charge provisions in the bills that ultimately were adopted.
During the public hearings on OPRA, there was some recorded commentary about the proposed statute's copying provisions. In particular, at a Senate hearing on March 9, 2000, Ron Miskoff, the president of the New Jersey Society of Professional Journalists, questioned the copying charges in the bills. Miskoff characterized the charges as being inflated, and out of step with the times and with copying charges established in other states. See Public Hearing on S.B. 161, 351, 573, and 866 Before the S. Judiciary Comm., 209th Leg. Sess. 85 (2000).
A-1309 was passed by the Assembly on June 29, 2000. It was then amended by the Senate on May 3, 2001 to reconcile it with S-2003. The reconciled bill, known as OPRA, was passed by both houses in January 2002 and signed into law by Governor *128 Donald T. DiFrancesco on January 8, 2002.[7]

B.
Having traced this legislative history, we now turn to the parties' competing interpretations of the meaning of Section 1A-5(b).
Plaintiffs argue that the provision should be read to mandate that the government always charge a citizen the "actual costs" of duplicating a government record, unless another statute or State regulation prescribes a different rate. In making this argument, plaintiffs place great emphasis on the first sentence of N.J.S.A. 47:1A-5(b), which calls for payment of "the actual cost of duplicating the record" where a different rate is not otherwise prescribed; and the fourth and final sentence of N.J.S.A. 47:1A-5(b), which authorizes the public agency to charge "the actual cost of duplicating [a] record" where it exceeds the levels identified in the second sentence of the provision. Plaintiffs further argue that even if N.J.S.A. 47:1A-5(b) were read to allow copying fees to be charged above actual costs, the common law of public access, as construed in Moore, supra, and subsequent case law, requires the imposition of an actual-costs price ceiling, because OPRA specifically preserves common law rights of access. See N.J.S.A. 47:1A-8.
Defendants, by contrast, emphasize different portions of N.J.S.A. 47:1A-5(b). Although their specific contentions vary somewhat, defendants' central argument is that the price schedule in the second sentence of N.J.S.A. 47:1A-5(b) represents a "default rate" for photocopying, which a government agency in New Jersey can lawfully charge without reference to the "actual costs" of such copying. Defendants maintain that if, as plaintiffs argue, "actual costs" always control, then there would have been no reason for the Legislature to have included a fee schedule in the second sentence of Section 1A-5(b). Defendants urge that we not read the fee schedule in the second sentence out of the statute.
Defendants also disagree with plaintiffs that the common law requires copying charges to be fixed or capped at actual costs. They further emphasize the substantial burdens of a County calculating actual copying costs on a continuous basis, as well as the needs for uniformity and administrative predictability. Lastly, they urge that any relief awarded to plaintiffs be prospective and not retroactive, given the adverse fiscal consequences that otherwise would be borne by taxpayers.

C.
In evaluating these competing arguments over how to construe Section 1A-5(b), we must bear in mind the public policies underlying the OPRA statute as a whole. The purpose of OPRA is "`to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process.'" Mason v. City of Hoboken, 196 N.J. 51, 64, 951 A.2d 1017 (2008) (quoting Asbury Park Press v. Ocean County Prosecutor's Office, 374 N.J.Super. 312, 329, 864 A.2d 446 (Law Div.2004)). Toward that end, the Legislature declared in OPRA, as "the public policy of this State," that "government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, *129 for the protection of the public interest...[.]" N.J.S.A. 47:1A-1 (emphasis added). "[A]ny limitations on the right of access accorded by [the former RKL][,] as amended and supplemented, shall be construed in favor of the public's right of access." Ibid. These broad legislative findings in favor of "readily accessible" government records have been repeatedly recognized and applied in case law under OPRA. See, e.g., Burnett v. County of Bergen, 198 N.J. 408, 421-22, 968 A.2d 1151 (2009); Mason, supra, 196 N.J. at 64-65, 951 A.2d 1017; Times of Trenton Publ'g Corp. v. Lafayette Yard Cmty. Dev. Corp., 183 N.J. 519, 535, 874 A.2d 1064 (2005); MAG Entm't LLC v. Div. of Alcoholic Beverage Control, 375 N.J.Super. 534, 544, 868 A.2d 1067 (App.Div. 2005).
These public policies in OPRA favoring reasonable citizen access to government records have long been part of our State's history and tradition. For example, in Moore, supra, 39 N.J. at 30, 186 A.2d 676, the Supreme Court acknowledged the "vital importance" of a citizen's right to inspect certain records maintained by the government. Thereafter, in Higg-A-Rella, Inc. v. County of Essex, 141 N.J. 35, 41, 660 A.2d 1163 (1995), another pre-OPRA case, the plaintiffs sought copies of computer tapes, as opposed to hard copies, of municipal tax assessment records. The Court held that under both the then-applicable RKL and the common law, copying fees should not be used to discourage public access to records. Id. at 53, 660 A.2d 1163.
We therefore parse the four sentences of N.J.S.A. 47:1A-5(b) cognizant of these strong legislative policies and traditions.

D.
The first sentence of Section 1A-5(b) instructs that "[a] copy ... of a government record may be purchased by any person upon payment of the fee prescribed by law or regulation ... [.]" N.J.S.A. 47:1A-5(b) (emphasis added). The first sentence further instructs that "if a fee is not prescribed by law or regulation, [then the copy may be purchased] upon payment of the actual cost of duplicating the record." Ibid. (emphasis added).
Skipping ahead for a moment, the third sentence of Section 1A-5(b) defines the "actual cost" of duplicating a record, which "shall be the cost of materials and supplies used to make a copy of the record ... [.]" Ibid. Actual cost "shall not include the cost of labor or other overhead expenses associated with making the copy except as provided for in [N.J.S.A. 47:1A-5(c)]," a separate provision which authorizes a "special service charge" when the duplication of a record involves "an extraordinary expenditure of time and effort." Ibid.[8]
Meanwhile, the second sentence of Section 1A-5(b) advises that "[e]xcept as otherwise provided by law or regulation, the fee assessed for the duplication of a government record embodied in the form of a printed matter shall not exceed [certain specified rates]." Ibid. Those specified rates are $0.75 per page for "the first page to tenth page"; $0.50 per page for the "eleventh page to twentieth page," and $0.25 per page for "all pages over twenty[.]" Ibid. We note that these rates in OPRA track the charges previously authorized under the former RKL, only increased by between $0.15 and $0.25. The second sentence of Section 1A-5(b) makes no reference to the "actual cost" verbiage in the first sentence. Also, the term *130 "printed matter" is not defined in the second sentence.
This statutory arrangement is further complicated by the fourth sentence of Section 1A-5(b), which specifies that "[i]f a public agency can demonstrate that its actual costs for duplication of a government record exceed the foregoing rates, the public agency shall be permitted to charge the actual cost of duplicating the record." Ibid. (emphasis added). The fourth sentence does not explain how its language addressing such higher "actual cost" scenarios correlates with the "actual cost" language in the first sentence.
To be sure, Section 1A-5(b) is not a model of clarity in draftsmanship. The four sentences of the provision, particularly if read out of the context of its legislative origins and State traditions, are seemingly circular and contradictory.[9] The first and fourth sentences appear to mandate an "actual cost" method for copying charges, at least where no different charge is prescribed by other statute or regulation. But the second sentence injects a detailed fee schedule that arguably is either superfluous to, or in conflict with, the statute's actual cost mandate. Despite these difficulties of expression, we endeavor to "effectuate the legislative intent in light of the language used and the objects sought to be achieved." State v. Maguire, 84 N.J. 508, 514, 423 A.2d 294 (1980).

E.
As a starting point for our analysis, we dispel any notion that the copying charges imposed by the three Counties constitute fees that are otherwise "prescribed by,"[10] or "provided by,"[11] a particular "law or regulation." Although the government records obtained and copied by plaintiffs were deeds or other real estate documents, records that must be maintained by the county clerk, the copying charges set forth in N.J.S.A. 22A:2-29 for duplicating such records do not apply to self-serve copies. See Dugan v. Camden County Clerk's Office, 376 N.J.Super. 271, 277-78, 870 A.2d 624 (App.Div.), certif. denied, 184 N.J. 209, 876 A.2d 283 (2005) (holding that the charges for such self-serve copies are governed by Section 1A-5(b) of OPRA and not by the fee schedule enumerated in N.J.S.A. 22A:2-29).
We do not consider the second sentence of Section 1A-5(b) as comprising, in and of itself, a "law or regulation" that "otherwise" controls the applicable copying rate. When the Legislature used the word "otherwise" in the second sentence of Section 1A-5(b), it manifestly intended to refer to codified enactments outside of that very same portion of OPRA. This conclusion is corroborated by the Sponsors Statement to S-2003, which notes that, apart from the per-page fee schedule identified in the bill, "[d]ifferent fees for the purchase of a copy of a record may be established by another statute or by regulation." S.B. 2003, supra, (Sponsors Statement) (emphasis added). If the Legislature had intended the rates in the second sentence of Section 1A-5(b) to be treated as such, it could have said so much more clearly and directly. Moreover, such a construction would nullify the first sentence of the statutory provision, which instructs that "actual costs" control in the absence of a supervening "law or regulation."
*131 In addition, we do not consider copying fee schedules that may be formally adopted by municipal or county governments to qualify as the other "law or regulation" referred to in the first and second sentences of Section 1A-5(b). Instead, we construe Section 1A-5(b)'s "law or regulation" reference to connote a statute, regulation, constitutional provision, or other legal mandate emanating from the federal or state government, not from a county or local agency or a records custodian.
Our interpretation on this point is bolstered by the fact that an earlier version of the bill that ultimately became the RKL in 1963 authorized "a reasonable fee ... to be fixed by regulation of the board, body, agency, department, commission, authority or officer having such records," implying that the enactment could be made by a records or a sub-State governmental unit. Assem. B. 344, supra. That language did not survive the final codification of the RKL in 1963, and it did not reappear within the terms of OPRA when the latter was enacted in 2000. There also is no case law or other authority supporting the notion that the Legislature freely delegated to the county and local governments the power to trump the copying-charge requirements of Section 1A-5(b).
We are aware of no federal or state "law or regulation," at least in codified form,[12] that overrides the copying charge provisions applicable here under Section 1A-5(b). We are left, therefore, with a need to resolve the tension between the "actual cost" language of the first, third and fourth sentences of Section 1A-5(a) and the sliding-scale fee schedule contained within the provision's second sentence.
Defendants argue that this tension within the statute was already resolved in Dugan, because we described the $0.25 per-copy charge within the second sentence of N.J.S.A. 47:1A-5(b) as "the default rate under OPRA" for copies over twenty pages. Dugan, supra, 376 N.J.Super. at 278, 870 A.2d 624. However, the "default rate" reference in Dugan is only dicta. Because the defendants in Dugan had charged the plaintiff copying fees exceeding the $0.25 per-page rate, we did not have the occasion to consider whether or not the fees needed to be calibrated to the county's actual costs. More importantly, we did not need to decide in Dugan how Section 1A-5(b) would apply if the county's "actual costs" were less than $0.25 per page. Our focus in Dugan was on the interplay between N.J.S.A. 22A:2-29 and OPRA, not upon how to construe the language within OPRA and how to parse the four sentences within N.J.S.A. 47:1A-5(b). That OPRA-specific task of statutory construction was left, in effect, to be resolved in future litigation such as the present appeals. In sum, we are not bound by the passing reference to "default rate" within Dugan, and defendants have given that reference undue significance.
If, as defendants argue, the fee schedule in the second sentence of Section 1A-5(b) was meant to operate as a pre-emptive "default," then the provision's reference to "actual cost" in the first sentence would become essentially meaningless. That is so because the default rate would always control in the absence of a fee prescribed by a separate statute or regulation.
Our task is to attempt to give meaning to all of the words of a statute, even if the Legislature could have expressed its aim more clearly. Statutory interpretations leading to "absurd or unreasonable results are to be avoided." Davis v. Heil, 132 N.J.Super. 283, 293, 333 A.2d 537 (App.Div.), aff'd, 68 N.J. 423, *132 346 A.2d 405 (1975). Moreover, when a statute is ambiguous, the court "must construe the statute in a way that will best effectuate the Legislature's intent." State v. Szemple, 135 N.J. 406, 422, 640 A.2d 817 (1994).
We have also considered whether the second sentence of Section 1A-5(b) can be reconciled with the other three sentences of that paragraph because the second sentence singularly refers to the copying of a government record "embodied in the form of printed matter." Ibid. The other sentences do not refer to "printed matter." This difference, however, does not prove to be meaningful in resolving the issues before us.
Some government records, such as maps and photographs, are not in printed form. See N.J.S.A. 47:1A-1.1 (broadly defining a "government record" under OPRA to include drawings, maps, photographs and other non-printed materials). The fee schedule in the second sentence appropriately recognizes that such non-printed materials may be harder or more time-consuming to copy. But the government records requested by plaintiffs in the instant cases are, in fact, printed materials. That being so, we cannot avoid the troublesome need to harmonize the treatment of photocopied printed materials within Section 1A-5(b).

F.
Defendants contend that an agency's actual costs cannot universally dictate the applicable copying charges because, if that were true, the fee schedule in N.J.S.A. 47:1A-5(b) would never apply. We appreciate this argument, and the need to imbue meaning to all of the words of the statutory provision. Green v. Auerbach Chevrolet Corp., 127 N.J. 591, 598, 606 A.2d 1093 (1992) ("a court `should try to give effect to every word of the statute, and should not assume that the Legislature used meaningless language.'" (quoting Med. Soc'y of N.J. v. N.J. Dep't of Law & Pub. Safety, 120 N.J. 18, 26-27, 575 A.2d 1348 (1990))).
In response to this concern, plaintiffs suggest that, as a means of harmonizing all four sentences within Section 1A-5(b), the provision as a whole should be construed as a burden-shifting mechanism. More particularly, they suggest that the word "demonstrate" appearing in Section 1A-5(b)'s fourth sentence signals that a county or other government agency may choose to charge document requestors copying fees that are above the rates stated in the second sentence, but only if the agency bears its burden of "demonstrating" that its actual reproduction costs are higher than those stated rates. Reciprocally, plaintiffs suggest that if the agency's actual costs are at or below the rates set forth in the second sentence, then the agency will be obligated to reduce its charges to that lower level, but only if a challenger "demonstrates" that those actual costs fall below the rate baselines. Such a burden-shifting interpretation would allow government agencies to enjoy some, albeit limited, freedom to adopt the fee schedule in the second sentence of N.J.S.A. 47:1A-5(b) as an expedient, leaving it up to a challenger to prove that the agency's actual costs are indeed lower.
Plaintiffs' burden-shifting concept is not directly explicated in the text of OPRA. However, the Legislature's choice of the word "demonstrate" in the fourth sentence of Section 1A-5(b) provides some support for reading the statute in this fashion. In this regard, we find it noteworthy that the Senate floor amendments to what would become OPRA, which were adopted on May 3, 2001, substituted the term "demonstrate" for "show" in the provision's fourth *133 sentence.[13] This nomenclature change from a mere "showing" to a more emphatic "demonstration"is consistent with plaintiffs' reading.
The term "demonstrate" is primarily defined in Webster's II New College Dictionary (1995 ed.) as "[t]o prove or make evident by reasoning or adducing evidence." Id. at 301. By contrast, "show" is primarily defined in that same dictionary as "[t]o make visible." Id. at 1022.[14] Although we do not wish to exaggerate the importance of this change in statutory phraseology, the substitution of the term "demonstrate" does comport with plaintiffs' overall argument.
Apart from the words of the statute itself and its legislative history, we note that several prior cases have alluded to the "actual costs" language of Section 1A-5(b). For example, in Constantine v. Twp. of Bass River, 406 N.J.Super. 305, 323, 967 A.2d 882 (App.Div.), certif. denied, 200 N.J. 208, 976 A.2d 384 (2009), we considered whether government records that must be reproduced and turned over to a defendant in criminal discovery must be copied at the OPRA rates. We held in Constantine that OPRA does not govern the criminal discovery process. Id. at 325, 967 A.2d 882. However, in the course of our discussion of OPRA, we did observe in Constantine that "absent a showing that `actual costs for duplication' exceed the fee schedule [of Section 1A-5(b)'s second sentence], these fees are maximum limits to be utilized whenever the `fee is not prescribed by law or regulation.' Otherwise, OPRA permits a government agency to charge only for the actual costs of duplication, and thus, applies the same fee limits associated with the common law right of public access." Id. at 324, 967 A.2d 882. (emphasis added).
Similarly, we observed in Libertarian Party of Cent. N.J. v. Murphy, 384 N.J.Super. 136, 139, 894 A.2d 72 (App. Div.), certif. granted and remanded on other grounds, 188 N.J. 487, 909 A.2d 723 (2006), that "the guiding principle set by the statute [is] that a fee should reflect the actual cost of duplication." (emphasis added). More recently, in Goldsmith v. Camden County Surrogate's Office, 408 N.J.Super. 376, 383, 975 A.2d 459 (App. Div.), certif. denied, 200 N.J. 502, 983 A.2d 1110 (2009), we addressed the timeliness of a plaintiff's challenge to a county's copying fee charges and did not resolve the merits of the challenge. However, we did note in Goldsmith that the plaintiff's complaint about the excessiveness of the County's copying charges, which allegedly exceeded its actual costs, "may have some merit." Id. at 383, 975 A.2d 459. We also emphasized in Goldsmith the well-settled principle that a fee for citizen access to government records "`must be reasonable, and cannot be used as a tool to discourage access.'" Ibid. (quoting Higg-A-Rella, supra, 141 N.J. at 53, 660 A.2d 1163).
In that same vein, the Supreme Court recently noted in another OPRA case, Burnett, supra, 198 N.J. at 408, 968 A.2d 1151:
OPRA provides that costs may be passed on to requestors. The statute allows for recovery of actual duplication costs. N.J.S.A. 47:1A-5(b). In addition, requestors may be assessed costs for preparation work involved in responding to a request. See N.J.S.A. 47:1A-5(c) (allowing reasonable special service charge when records cannot be reproduced *134 using ordinary equipment or reproduction involves extraordinary expenditure of time and effort); N.J.S.A. 47:1A-5(d) (allowing reasonable special charge if "a substantial amount of manipulation" is required).
[Id. at 438, 968 A.2d 1151 (emphasis added).]
Although the discrete issues before the Court in Burnett involved who should bear the costs of redacting Social Security numbers from government records when they are supplied to a commercial requestor, the dictum from Chief Justice Rabner's opinion we have quoted above is consistent with the interpretation of Section 1A-5(b) that we have adopted in this opinion.
An additional factor that favors plaintiffs' suggested interpretation is the common law itself. OPRA explicitly states that it was not intended to be in derogation of the common law. See N.J.S.A. 47:1A-8. When that common-law tradition was explained in Moore in 1962, the Supreme Court referred to both the government agency's "actual" and "reasonable" costs of duplicating government records. Moore, supra, 39 N.J. at 31, 186 A.2d 676. Although we need not and do not reach in the present appeals whether the common law prohibits a government agency from ever charging more than "actual costs" for duplicating records, our State's common-law tradition at least reinforces plaintiffs' interpretation of OPRA, a statute designed to extend, not emasculate, the common law.
For all these reasons, we therefore adopt plaintiffs' "burden-shifting" construction of N.J.S.A. 47:1A-5(b), fully aware that the statute is murky and that its true intended meaning is not entirely free from doubt.

G.
Having adopted plaintiffs' substantive position, we are sensitive to defendants' legitimate concerns about administrative feasibility and fiscal impact. However, we believe those respective concerns can be appropriately managed.
As to administrative feasibility, we do not believe the Legislature intended in OPRA to require a government agency to continually re-calculate its actual costs and establish a "new" copying rate every time a citizen makes copies of a government record. Such an obligation would be unwieldy and absurd. Instead, we interpret OPRA to require simply that the government agency re-calibrate its copying charge schedule with reasonable periodic frequency. We believe that it would be reasonably sufficient for the agency to perform such re-calibrations on at least an annual basis.
By analogy, similar periodic adjustments are reflected in other State regulations. For instance, N.J.A.C. 8:43G-15.3 requires that a patient be furnished a copy of his or her medical records at "actual cost" of copying, but in any case not to exceed one dollar per page. N.J.A.C. 8:43G-15.2 provides that the fees be reviewed once every three years. Likewise, N.J.A.C. 8:43A-13.5(c) provides for periodic reevaluation of the reasonableness of the fee scale applicable to ambulatory medical facilities. Furthermore, N.J.A.C. 11:24-10.4 provides for copies of medical records by an HMO at a price "not to exceed prevailing community rates for photocopying." A periodic recalibration of copying fees under N.J.S.A. 47:1A-5(b) would appear to be similarly feasible.
Moreover, actual per-page costs may be reasonably approximated. A margin of error of a penny or two in the per-page rate will be tolerable. The costs *135 may be averaged for the copy equipment used in all county offices.
We are equally sensitive to fiscal impact considerations, especially in the present severe economic times that exist not only in New Jersey, but in the nation as a whole. We are mindful that defendants and the amici counties have likely relied in good faith on our "default rate" reference in Dugan, and that such reliance has affected their budgetary plans. We also note that defendants' construction of the text of N.J.S.A. 47:1A-5(b) was not frivolous, even though we have ultimately found their position unpersuasive.
Consequently, we shall make our decision prospective only, effective on July 1, 2010, the start of the next State fiscal year, unless the Legislature enacts a statutory amendment prescribing otherwise. See, e.g., Salorio v. Glaser, 93 N.J. 447, 464-65, 461 A.2d 1100, cert. denied, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983) (giving only prospective application to an opinion constitutionally invalidating a tax imposed on New York commuters who worked in New Jersey, in light of the State's past reliance on revenues from the tax and the need to maintain public fiscal stability). Retroactive relief is denied.
Following the effective date, the defendant Counties and other government agencies may not charge requestors more than the "actual costs" of photocopying government records. If charges imposed are equal to or less than those stated in the second sentence of Section 1A-5(b), a challenger would have the burden of demonstrating that the agency's actual costs were indeed lower. If the challenger fails to sustain that burden, the agency will prevail and may continue to charge its existing rates. On the other hand, if the agency's charges exceed the rates stated in the second sentence, then the burden will be placed on the agency to demonstrate that its actual costs are indeed higher than those enumerated rates and are therefore justified.
If the proofs are inconclusive or in equipoise,[15] then the outcome shall be in favor of the party who does not have the burden of persuasion. The conventional preponderance-of-the-evidence standard for civil cases shall apply. See Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169, 892 A.2d 1240 (2006) (noting that "[a]s a general rule, the preponderance of evidence standard applies in civil actions"). These burden-shifting principles shall be observed, whether a dispute over the propriety of copying rates is litigated in a court or is presented administratively to the Government Records Council. See N.J.S.A. 47:1A-6 (noting the Council's concurrent jurisdiction to hear OPRA disputes); see also Fisher v. Div. of Law, 400 N.J.Super. 61, 70, 946 A.2d 53 (App.Div. 2008).

IV.
In light of our disposition on the merits, and the prospective nature of our decision, we need not address the other issues raised on the appeal and the cross-appeal, including the timeliness of plaintiffs' lawsuits, the class certification issues, the quantum of damages or other retroactive relief, and the various other issues and sub-issues raised. We do not resolve plaintiffs' potential entitlement to counsel *136 fees under N.J.S.A. 47:1A-6, and defer to the trial courts any such fee-shifting claims, including counsel fees incurred on the appeals. See R. 2:11-4.
We have endeavored in this opinion to adhere to the most probable intent of the Legislature, even though its wishes are rather cryptically expressed in the present statute. If the Legislature prefers a different approach, it surely can revise N.J.S.A. 47:1A-5 in a manner that makes the applicable copying rates clearer and more definitive, as was attempted in the last legislative session.[16] Absent such legislative action, government entities shall be guided by the interpretation set forth in this opinion.
The matters are deconsolidated and individually remanded to the Law Division for further proceedings consistent with this opinion.
NOTES
[1] Thereafter, Sussex County again revised its mode of reproducing government records for citizen requestors. As of November 2007, all public records contained in Sussex County offices were searchable on-line and could be printed at no charge on a home or office computer.
[2] Passaic filed three identical amicus briefs as well as a letter brief. Mercer joined with Hudson and filed two identical amicus briefs in A-2507-08 and A-2518-08. Middlesex filed two identical amicus briefs in A-2507-08 and A-2518-08. Morris filed one amicus brief for all three cases.
[3] The volunteer rule is not asserted in O'Shea by the Sussex defendants. We are also mindful that the trial court in Gensch did not reach the merits of the Hunterdon defendants' voluntary payment argument.
[4] We need not reach the additional rationales offered by plaintiffs for not applying the volunteer rule.
[5] Referring to N.J.S.A. 47:1A-5(c), which authorizes the imposition of a "special service charge" when reproducing a requested record involves "an extraordinary expenditure of time and effort." Ibid.
[6] Pertinent documents in the legislative history of OPRA are compiled at http://www. njstatelib.org/NJLH/lh2001/ch404.htm.
[7] In 2008, numerous bills were introduced in the Assembly and Senate, which sought to clarify or revise the copying fees set forth in N.J.S.A. 47:1A-5(b). None of those measures was enacted into law during the now-expired 213th Legislative Session.
[8] None of the records requested by the instant three plaintiffs are claimed to be unusually large or odd-shaped documents that required extraordinary efforts to duplicate. Therefore, the "special service charges" of Section 1A-5(c) are not applicable here.
[9] Divining the meaning of the provision is akin to making sense of the paradoxical statement, "This sentence is false."
[10] See N.J.S.A. 47:1A-5(b) (first sentence).
[11] See N.J.S.A. 47:1A-5(b) (second sentence).
[12] We discuss plaintiffs' common-law claims, infra.
[13] See Assem. B. 1309, 209th Leg. Sess. (2000) (Fifth Reprint).
[14] However, the third usage in Webster's does list "demonstrate" as a synonym for "show." Ibid.
[15] Although we suspect that the calculation of actual costs often could be straightforward and determined with simple arithmetic, there may be instances in which there are disputed issues of accounting, amortization, and cost allocation or other subjective factors that could make it difficult to fix "actual costs" definitively. We envision that the burden-of-proof construct will make a difference in resolving such "grey area" cases.
[16] We express no opinion, of course, about the merits of any of the bills that were previously introduced on the subject, or whether those bills would be in derogation of the common law.